**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SARA ROSENBERG,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 21-2673-KSM** |
| **NASSAU LIFE & ANNUITY COMPANY**, et al., | |
| Defendants. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                      **July 13, 2022**

Plaintiff Sara Rosenberg, acting as trustee for the Douglas Rosenberg 2004 Trust (the "Trust"), brings claims for breach of contract, unjust enrichment, fraudulent misrepresentation, negligent misrepresentation, and violation of Pennsylvania's Unfair Trade Practices & Consumer Protection Law (the "UTPCPL") against Defendant PHL Variable Insurance Company ("PHL Variable") and Defendants PHL Delaware, LLC, Nassau Insurance Group Holdings, L.P., and Nassau Financial Group, L.P. (collectively, the "Nassau Defendants," and together with PHL Variable, the "Defendants"). Defendants have filed a motion to dismiss. For the reasons discussed below, the motion is granted in part and denied in part.

**I.  BACKGROUND FACTS**

Taking the allegations in the Second Amended Complaint (Doc. No. 19) as true,[1] the relevant facts are as follows.

_____

[1] When reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "must accept the allegations in the complaint as true, but are not compelled to accept unsupported

### A.      The Initial Policy

On May 7, 2001, Defendant PHL Variable issued a $20 million life insurance policy on the life of Maury Lane Rosenberg (the "Policy").  (Doc. No. 19 at ¶ 15.)  Douglas Rosenberg is Maury's son and the named beneficiary for the Trust, which is, in turn, the named owner and beneficiary on the Policy.[2]  (*Id.*)  The Policy was set to last for 20 years, giving it an expiration date of May 7, 2021.  (*Id.* at ¶ 23.)  During that 20-year period, the Trust paid the Policy's annual premiums, which varied from year to year, but totaled more than $1 million over the lifetime of the Policy.  (*Id.* at ¶¶ 24, 26–27.)

In addition to paying the Policy's premiums and being entitled to the death benefit, the Trust retained certain rights that it could exercise while the Policy was in force, i.e., "lifetime benefits."  (*Id.* at ¶ 28.)  These lifetime benefits included the right to "convert this policy until" May 7, 2021.  (*Id.* at ¶ 29 (quoting *id.* Ex. 2 at Policy Summary).)  More specifically, the Trust could "convert this Policy, without evidence of insurability, to a new Policy on the life of the same insured under this Policy but on a different plan of insurance."  (*Id.* at ¶ 30; *id.*, Ex. 2 at p. 4.)  This conversion right extended to "any whole life or universal life insurance plan" that PHL Variable or its affiliates "offer[ed] at the time of conversion."  (*Id.* at ¶ 31; *id.*, Ex. 2 at p. 4.)

---

conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quotation marks omitted).

[2] When the Policy was issued, the named owner and beneficiary was a Trust for the benefit of Douglas Rosenberg, which was established in August 1989 (the "1989 Trust").  (*Id.* at ¶ 16.)  Douglas's wife, Sara Rosenberg, served as trustee of the 1989 Trust.  (*Id.*)  In 2004, Douglas Rosenberg assigned the assets of the 1989 Trust, including the Policy, to the newly established Douglas Rosenberg 2004 Trust, for which Sara Rosenberg again served as trustee.  (*Id.* at ¶ 18.)

### B.      The PAUL IV Policy

In 2016, fifteen years after PHL Variable issued the Policy, the Nassau Defendants

acquired PHL Variable and since then have provided "management, customer service, and other

services to PHL Variable and its policyholders."  (*Id.* at ¶¶ 20–21.)

In November and December of 2019, Sara Rosenberg began investigating the Trust's

conversion options under the Policy, with the expectation that it would convert the Policy

sometime in 2020 or 2021.  (*Id.* at ¶ 33.)  Working with Douglas Rosenberg and a Pennsylvania

insurance agent, Sara Rosenberg reached out to PHL Variable and the Nassau Defendants by

phone and email, requesting the premium calculations and illustrations for any policies available

for conversion.  (*Id.* at ¶ 34.)  In response, Defendants provided three options for conversion to a

Phoenix Accumulator Universal Life ("PAUL") IV policy.  (*Id.* at ¶¶ 37–38.)  The first was a

$20 million PAUL IV policy with an annual premium of around $789,000.  (*Id.* at ¶ 37.)  The

second was a $5 million PAUL IV policy with an annual premium of around $197,000.  (*Id.* at

¶ 38.)  And the third was a $1 million PAUL IV policy with an annual premium of around

$40,000.  (*Id.*)  The illustrations for each policy reflected a rate of approximately $39.50 per

$1,000 of coverage.  (*Id.* at ¶ 39.)

The agents also explained that the PAUL IV options would not be available in 2020.  (*Id.*

at ¶ 42.)  They would not, however, provide any information on the pricing and structure of

future conversion options, asserting that they did not know or have access to such information.

(*Id.* at ¶¶ 43–44.)  Hedging its bets, the Trust converted $10 million, or half, of the Policy to the

PAUL IV option in December 2019.  (*Id.*  at ¶ 46.)  Although the Trust wanted to convert the

entire $20 million of the Policy, it reasoned that it would have comparable options in the new

year given the alleged lack of information about any new type of plan and Defendants' business

model and marketing strategy to date.  (*Id.* at ¶ 47 ("Given that dropping an affordable universal

3

life policy would represent a major change in strategy and marketing for Defendants and their affiliates, the Trust relied on the alleged unavailable [sic] of information related to any future policy options as evidence that an alternative to PAUL IV would be offered, and thus relied on the absence of such information in deciding against converting the entire policy.").)

### C.    The Remembrance Policy

On January 14, 2020, two weeks after Defendants' agents told Rosenberg that they had no information about the policies that would be available in 2020, Defendants informed Rosenberg that the only non-term life insurance product now available for conversion was a Remembrance whole life policy.  (*Id.* at ¶ 53; *see also id.* at ¶ 54 (alleging that the Remembrance policy was the only non-term policy offered to the Trust in 2020 and 2021).)  Unlike the PAUL IV option, which was a traditional life insurance policy (i.e., providing an insured with insurance coverage that would match an insured's need to financially support his or her family after death), the Remembrance policy is a limited purpose whole life product with a guaranteed cash value that is designed to cover funeral expenses and emergency funds in the case of illness or death. (*Id.* at ¶ 56.)

The Trust did not, however, "desire a policy for funeral expenses, illness, or death, and it did not desire a policy with significant cash value."  (*Id.* at ¶ 60.)  Nor did it wish to pay the significant annual premiums that came with the Remembrance policy.  At a rate of around $90 for every $1,000 of coverage, the premiums for the Remembrance policy were more than double the annual premiums for the PAUL IV policy.  (*Id.* at ¶ 59.)  At that rate, a $5 million Remembrance policy carried an annual premium of approximately $450,000, and to convert the remaining $10 million of the Plan would cost around $900,000 a year.  (*Id.*)  According to Rosenberg, this made "conversion economically unfeasible."  (*Id.*)

When the Trust's representatives learned about the Remembrance policy, they asked Defendants to permit the Trust to convert the remaining $10 million of the Policy to the PAUL IV product.  (*Id.* at ¶ 68.)  Defendants refused.  (*Id.* at ¶ 69.)  And on May 9, 2021, Defendants sent the Trust a "Notice to Prevent Lapse," stating that the non-converted portion of the Policy would lapse if they did not receive a premium payment of $283,142.06.  (*Id.* at ¶ 71.)  This premium was significantly more than the Trust would have had to pay had it converted the entire Policy to the PAUL IV option.  (*Id.*)

## II.  PROCEDURAL HISTORY

Sara Rosenberg filed this action on June 14, 2021 against PHL Variable and the Nassau Defendants.  (Doc. No. 1.)  She alleges that Defendants "knew and withheld from Plaintiff and its other policyholders its intention to only offer a far more expensive conversion product in order to induce its policyholders not to convert before December 31, 2020 [sic]."  (Doc. No. 19 at ¶ 62; *see also id.* at ¶ 73 ("Nassau did not inform the 2004 Trust that Nassau would not sell any universal life policies in 2020, despite having made the decision prior to December 31, 2019.").)  According to Rosenberg, it is not only unlikely, but "impossible," that Defendants waited until January 14, 2020 to decide to offer *only* a whole life Remembrance policy, or to have established standard policy terms, policy forms, and pricing for the Remembrance product.  (*Id.* at ¶¶ 63–64 ("Indeed, the Nassau Remembrance life product was already in existence no later than October 2019.").)

Rosenberg alleges that Defendants concealed this information from policyholders like the Trust "as part of a company-wide effort to protect the company at the expense of its policyholders by driving the owners of beneficiaries of valuable policies away from conversion or retention and into lapse by making such policies impossibly expensive to maintain."  (*Id.* at ¶ 74.)  She claims that if the Trust had been advised of the Remembrance product before

December 31, 2019, it would have converted the entire Policy to the PAUL IV product, instead of only $10 million.  (*Id.* at ¶ 61.)  Last, Rosenberg alleges that in addition to withholding information about the Remembrance product until after conversion to PAUL IV was unavailable, Defendants also failed to tell the Trust about whole life and universal life policies available through PHL Variable's affiliates, as required by the Policy.  (*Id.* at ¶ 70.)

Rosenberg brings causes of action for breach of contract (Count I) and in the alternative, unjust enrichment (Count V), against PHL Variable.  She also brings claims for fraudulent misrepresentation (Count II), negligent misrepresentation (Count III), and violation of Pennsylvania's UTPCPL (Count IV) against all Defendants.  Defendants have moved to dismiss the Second Amended Complaint in its entirety.  (*See* Doc. No. 22.)  Rosenberg opposes their motion.  (Doc. No. 23.)

## III.   STANDARD OF REVIEW

### A.    *Federal Rule of Civil Procedure 8(a)(2)*

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  This Rule does not require detailed pleading, but instead, demands only that the allegations in the complaint give "the defendant fair notice of what the claim is and the grounds upon which it rests."  *McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 266 (3d Cir. 2016) (quoting *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016)) (cleaned up); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." (quotation marks omitted)).

As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings."  *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410,

1426 (3d Cir. 1997). "However an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Id.* (cleaned up).

### B.    Federal Rule of Civil Procedure 9(b)

When a plaintiff alleges fraud, Rule 9(b), not Rule 8(a), applies. Under Rule 9(b), a party "alleging fraud . . . must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy this standard, the complaint "must provide all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where, and how of the events at issue." *United States v. Eastwick Coll.*, 657 F. App'x 89, 93 (3d Cir. 2016).

## IV.    DISCUSSION

Defendants move to dismiss the Second Amended Complaint in its entirety. (*See* Doc. No. 22.) We address the breach of contract claim (Count I) before turning to the tort claims (Counts II, III, and IV), and finally, to Rosenberg's alternative claim for unjust enrichment (Count V).

### A.    Count I:  Breach of Contract

Rosenberg brings a breach of contract claim against PHL Variable. "[F]or a plaintiff to maintain a successful cause of action for breach of contract, the plaintiff must demonstrate the following: (1) the existence of a contract between the plaintiff and defendant, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) damages resulting from a breach of that duty." *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1125 (Pa. Super. Ct. 2004); *see also In re Lincoln Nat'l COI Litig.*, 269 F. Supp. 3d 622, 632 (E.D. Pa. 2017) ("In order to state a claim for breach of contract, a plaintiff must allege the existence of a contract, including its essential terms, a breach of a duty imposed by the contract and resulting

damages."). PHL Variable focuses on the second element, arguing that Rosenberg failed to allege that it breached any duty imposed by the Policy. (Doc. No. 22 at p. 13.) Rosenberg responds that she has "alleged a breach based on both an express contract term and the implied covenant of good faith and fair dealing." (Doc. No. 23 at p. 15.)

### 1.   <u>Breach of an Express Term</u>

First, Rosenberg argues that PHL Variable breached the lifetime benefits provisions outlined in Part 6 of the Policy, including the "right to convert this Policy, without evidence of insurability, to a new Policy on the life of the same insured under this Policy but on a different plan of insurance."[3] (Doc. No. 19 at p. 39.) This provision specifies that the new policy must be "a[ ] whole life or a[ ] universal life insurance plan" that PHL Variable or its "affiliate companies offer at the time of conversion . . . so long as it provides for a level death benefit and [PHL Variable or its] affiliate companies issue that plan with the Face Amount requested." (*Id.*)

Rosenberg alleges that PHL Variable breached this provision "by not offering every available term or universal life policy offered by it or its affiliates." (*Id.* at ¶ 79.) Although Rosenberg has not identified a specific alternate policy, she does allege "[o]n information and belief . . . that some of [PHL Variable's] affiliates offered other whole life or universal life policies in 2019, 2020, or 2021, yet Defendants never offered those policies to the Trust." (*Id.* at ¶ 70.) And with her response brief, Rosenberg provides a list of 20 companies affiliated with PHL Variable, 15 of which are operating insurance entities. (Doc. No. 23 at p. 50; *see also id.* at p. 16 n.2 (arguing that "in light of both Defendants' financial incentives and the number of acknowledged affiliate companies, it is plausible that at least one of those affiliates offered a

---

[3] Because Rosenberg's breach of contract claim is based on the Policy, we may consider its terms in deciding this motion to dismiss.

policy between 2019 and 2021 that PHL[ Variable] failed to present" to Rosenberg as a viable conversion option).)

PHL Variable takes issue with Rosenberg's allegation because it is based on "information and belief," arguing that she "could have specified from publicly-accessible information which product offerings were available from PHL [Variable's] affiliates and which it would qualify for, but she did not."  (Doc. No. 22 at p. 15.)  This places too a high a burden on Rosenberg at the pleading stage.  The Third Circuit has found that "pleading upon information and belief is permissible 'where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control'—so long as there are no 'boilerplate and conclusory allegations' and 'plaintiffs accompany their legal theory with factual allegations that make their theoretically viable claim plausible.'"  *McDermott*, 649 F. App'x at 268 (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002)) (cleaned up); *see also Shopman's Local Union 502 Pension Fund v. Samuel Grossi & Sons, Inc.*, __ F. Supp. 3d __, Civil Action No. 20-cv-5776, 2022 WL 63038, at *6 (E.D. Pa. Jan. 6, 2022) ("'[U]pon information and belief' pleading is appropriate where, as here, the requisite factual information is peculiarly within the defendant's knowledge or control." (quotation marks omitted)); *Pontiaki Spec. Maritime Enters. v. Talveras Grp.*, Civ. No. 16-247-LPS, 2016 WL 4497058, at * 3 (D. Del. Aug. 26, 2016) ("The Court finds that, because much of the relevant information is in Defendants' control, and because Pontiaki has supported its theory with sufficient factual allegations and exhibits, the pleadings made on information and belief are appropriate and will be considered in evaluating the motion to dismiss.").

The policies offered by PHL Variable's affiliate companies during the relevant period, if any, are clearly matters "within the defendant's knowledge or control."  And Rosenberg's

allegation is more than mere boilerplate or a conclusory assertion.  To the contrary, it explains *how* PHL Variable breached the Policy—by withholding viable options for conversion.  *See McDermott*, 649 F. App'x at 268 (finding that the relevant allegations were not "merely legal conclusions" or "boilerplate" because they "explain[ed] *how* Clondalkin allegedly breached the contract"); *see also Doggie Dental, Inc. v. Cdoffice*, Civil Action No. 2:21-cv-00271, 2021 WL 5411432, at * 4 (W.D. Pa. Sept. 7, 2021) ("The Court concludes that these allegations provide more than a conclusory boilerplate statement that defendants were working in concert.  Rather, they explain *how* the defendants allegedly worked together in a common scheme to profit off the unauthorized use of Plaintiffs' intellectual property.").  Therefore, we may consider the "on information and belief" allegations.

With those allegations in mind, we turn to PHL Variable's argument that the breach of contract claim fails because the Policy "only gives the holder of a term policy the option of converting to any whole life or universal plan that PHL [Variable] is then offering for new sales," and the only qualifying plan being offered in 2020 was the Remembrance option.  (Doc. No. 22 at p. 14.)  This argument rests on a dispute of fact.  At this stage, we must accept as true the factual allegations in the Second Amended Complaint, including the allegation that PHL Variable's affiliates did offer qualifying policies.[4]  Taking that allegation as true, Rosenberg has stated a claim for breach of the Policy's express provisions.

---

[4] PHL Variable references two cases which it asserts "dismissed similar breach of contract claims where the insurers stopped offering *any* policies for conversion."  (Doc. No. 22 at p. 14 (emphasis added).)  Because we assume for purposes of this motion that PHL Variable's affiliates did offer other qualifying policies, these cases are not controlling on the issue before us—whether PHL Variable breached the Policy when its affiliates offered qualifying plans at the time of conversion and it failed to tell the Trust about those options.  *Contra. Iacono v. ReliaStar Life Ins. Co. of N.Y.*, 559 F. Supp. 3d 141, 144 (E.D.N.Y. 2021) (finding the insurer did not breach the insurance policy's exchange provision because "surrender of the policy, a prerequisite for the exchange provision, may only occur prior to the Maturity Date," which was February 17, 2019, but the insured "made no demands . . . concerning the exercise of a policy exchange until May 2019, several months after the maturity date"); *Wiseman v. ING*

## 2.  **Breach of the Implied Covenant of Good Faith and Fair Dealing**

In addition to her claim for breach of the contract's express provisions, Rosenberg also alleges that PHL Variable breached the implied covenant of good faith and fair dealing.  (Doc. No. 19 at ¶¶ 80–85.)  Section 205 of the Second Restatement of Contracts outlines this covenant, stating, "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."  Restatement (Second) of Contracts § 205; *see also Baker v. Lafayette Coll.*, 504 A.2d 247, 255 (Pa. Super. Ct. 1986) ("We hold that the College had a limited duty to evaluate Baker in good faith which is defined by the terms of the College's contractual undertakings.  This is consistent with the general duty of contracting parties to perform their contractual obligations in good faith set forth in the Restatement (Second) of Contracts at section 205.").  "Good faith" has been defined as "[h]onesty in fact in the conduct or transaction concerned."  *Creeger Brick & Building Supply Inc. v. Mid-State Bank & Tr. Co., SEDA*, 560 A.2d 151, 153 (Pa. Super. Ct. 1989).

Although the full meaning of "good faith" varies with context, *Baker*, 504 A.2d at 255, courts agree that "the duty of good faith limits the parties' ability to act unreasonably in contravention of the other party's reasonable expectations."  *Montanez v. HSBC Mortg. Corp. (USA)*, 876 F. Supp. 2d 504, 513 (E.D. Pa. 2012) (quoting 3A Arthur L. Cobin, *Corbin on Contracts* § 654A(B), at 89 (Supp. 1994)).  For example, a party may breach this duty through "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to

---

*Groep, N.V.*, No. 16-cv-07587 (AJN), 2017 WL 4712417, at *5 (S.D. N.Y. Sept. 28, 2017) (finding "[t]he exchange term of the policy expressly stated that an exchange could be 'to any plan of whole life or endowment *that we issue at the time of the exchange*,'" but "*Plaintiff* acknowledges that the Insurers did *not* offer a whole life policy covering a woman of Olga Wiseman's age at any time after Plaintiff first requested a policy exchange," and therefore, the insurers "did not breach the terms of the contract" (emphases added)).

cooperate in the other party's performance." *Presque Isle Colon & Rectal Surgery v. Highmark Health*, 391 F. Supp. 3d 485, 513 (W.D. Pa. 2019).  The covenant also precludes a party from exercising its discretion under the contract in an unreasonable manner.  *Montanez*, 876 F. Supp. 2d at 513; *see also In re Lincoln Nat'l COI Litig.*, 269 F. Supp. 3d at 638 (explaining that Pennsylvania recognizes "an implied covenant of good faith where, as here, the defendant is expressly given a constrained amount of discretion under the Policy").  And in the insurance context, the covenant requires that the insurer "deal with the insured fairly, honestly, and objectively," and that it "act in good faith at all times, giving the interests of the insured the same consideration it gives its own."  *Ironshore Spec. Ins. Co. v. Conemaugh Health Sys. Inc.*, 423 F. Supp. 3d 139, 153 (W.D. Pa. 2019); *see also Dercoli v. Pa. Nat'l Mut. Ins. Co.*, 554 A.2d 906, 909 (Pa. 1989) (concluding that insurers were "bound to deal with the [insured] on a fair and frank basis, and at all times, to act in good faith," and explaining that the "duty of an insurance company to deal with an insured fairly and in good faith includes the duty of full and complete disclosure as to all of the benefits and every coverage that is provided by the applicable policy or polices along with all requirements, including any time limitations for making a claim").

The Second Amended Complaint alleges that PHL Variable breached the implied duty of good faith and fair dealing:  (1) in 2019, when it failed to inform the Trust of its intent to no longer sell any universal life insurance policies, and (2) in 2020, when it refused to allow the Trust to convert the remaining portion of the Policy to the PAUL IV option.[5]  (Doc. No. 19 at

---

[5] Rosenberg also alleges that "PHL Variable breached the implied duty of good faith and fair dealing by refusing to disclose information to Plaintiff which was necessary for Plaintiff to exercise her right to convert the Policy."  (Doc. No. 19 at ¶ 82.)  To the extent Rosenberg is referencing PHL Variable's duty to disclose policies offered by its affiliates, it is duplicative of Rosenberg's claim for breach of the contract's express terms and must be dismissed.  *See ClinMicro Immunology Ctr., LLC v. PrimeMed, P.C.*, Civil Action No. 3:11–02213, 2012 WL 3011698, at *9 (M.D. Pa. July 23, 2012) ("Count XII of the Complaint will be dismissed because it is duplicative of Plaintiff's breach of contract claims. In particular, Plaintiff adequately alleged breaches of the LMA and LSA in Counts I and II.  And,

¶¶ 84–85.)  PHL Variable counters that it was not required to "preview its 2020 product lineup" or otherwise notify Rosenberg that in 2020 it would not offer a product similar to the PAUL IV option offered in 2019 and the years prior.  (Doc. No. 22 at p. 16.)  And, PHL Variable argues, it was not required to allow the Trust to convert the remainder of the Policy to the PAUL IV product in 2020 because that product was not offered in 2020.  (*Id.*)

The Southern District of New York's analysis in a similar case is instructive.  *See Wiseman*, 2017 WL 4712417, at *8.  In *Wiseman*, an exchange provision in the plaintiff's life insurance policy gave her the right to "exchange this Policy for a new Policy" and specified that "[s]uch exchange may be to any plan of whole life or endowment that we issue at the time of exchange," with certain enumerated exceptions.  *Id.* at *2.  Twenty-four years after the policy was issued, and as it reached its maturity date, the plaintiff notified her insurer that she was exercising her rights under the exchange provision.  *Id.*  But the company refused to exchange the policy, explaining that it did "not have a whole life insurance plan available for issue."  *Id.* at *3.  "As a result of the Insurers' refusal to exchange the policy, it lapsed upon its maturity in October 2016, causing Plaintiff to lose all of the premiums paid into the policy over 25 years and losing any death benefit."  *Id.*

The plaintiff filed suit against her insurers, bringing among other claims, claims for breach of the contract's express terms and breach of the implied covenant of good faith and fair dealing.  *Id.* at *4.  The insurers moved to dismiss the complaint, and the court granted their motion in part and denied it in part.  *Id.* at *5.  First, the court dismissed the breach of contract claim, finding that "[b]ecause the unambiguous language of the contract required the Insurers to

---

as the provisions Plaintiff relies on for the breach of the duty of good faith and fair dealing claim are encompassed within the breach of contract claims in Counts I and II, Count XII is superfluous and duplicative of these claims.").

exchange Plaintiff's policy only for another policy that was generally offered, and because Plaintiff concede[d] that no such policy existed . . . at the time of Plaintiff's multiple requests for an exchange, the Insurers did not breach the contract by failing to exchange the policy." *Id.* Likewise, "because the terms of the policy contained no language obligating the Insurers to maintain whole life policies to cover every person insured by a flexible exchange policy or to inform policyholders if such whole life policies become unavailable, Plaintiff ha[d] not plausibly alleged a breach of contract claim." *Id.* at *7.

The Court declined, however, to dismiss the plaintiff's claim for breach of the implied covenant of good faith and fair dealing, finding that the plaintiff plausibly alleged that the insurers acted in bad faith. *Id.* at *9. The Court concluded that "[a]lthough no contractual provision required the Insurers to maintain a generally available policy" for exchange or that they notify her when such a policy would no longer be available, the plaintiff "plausibly alleged that a reasonable person purchasing the same insurance policy as Plaintiff would assume based on the exchange provision and other factors that the Insurers would maintain such a policy or would notify her and adjust her premiums if such a policy became unavailable." *Id.* at *8; *see also id.* at *9 (finding that the plaintiff "plausibly alleged that a reasonable customer in Plaintiff's position could have presumed that *some* policy would exist for which the customer could exchange the original policy").

Unlike the insurer in *Wiseman*, PHL Variable gave the Trust a conversion option—the Remembrance product. Nevertheless, the Court finds *Wiseman*'s analysis instructive because Rosenberg alleges that the Remembrance policy was the equivalent of no option. In other words, Rosenberg alleges that the annual premiums under the Remembrance policy were so much higher than the premiums under the PAUL IV option that conversion was "economically

unfeasible." (Doc. No. 19 at ¶ 59.) Rosenberg argues that the implied covenant thus required PHL Variable to give notice of its decision to offer only the Remembrance policy, and that its failure to do so was "incompatible" with "any reasonable understanding" of the Trust's rights under the Policy. (Doc. No. 23 at p. 19; *cf. id.* at p. 18 (noting that "PHL[ Variable] had historically offered" at least one product like the PAUL IV product, that the "life insurance industry usually did not impose price increases from year-to-year exceeding 10 to 20 percent," and that the Policy broadly allowed Rosenberg to select a product offered by any of its affiliate companies).) According to Rosenberg, the failure to notify was part of a concerted effort by PHL Variable to "induce lapse or avoid conversion, and that such failure to take action was designed to benefit PHL Variable and Nassau [Defendants'] finances at the expense of policyholders." (Doc. No. 19 at ¶ 51.)

Accepting these allegations as true and considering the Second Amended Complaint in its entirety, the Court finds that Rosenberg has plausibly alleged a claim for breach of the implied covenant of good faith and fair dealing as to PHL Variable's failure to tell the Trust about the Remembrance policy, or at minimum, to inform the Trust of its intent to no longer sell any universal life insurance policies.[6] *See In re Lincoln Nat'l COI Litig.*, 269 F. Supp. 3d at 638 ("Plaintiffs have therefore adequately alleged that Defendants breached the implied covenant by exercising their limited discretion under the Policies in an unreasonable and unfair manner with the bad faith intent of inducing lapses, frustrating policyholders' expectations and depriving them of the benefit of the agreement."); *Montanez*, 876 F. Supp. 2d at 513 ("[P]laintiffs have alleged facts sufficient to state a claim for breach of the implied covenant of good faith and fair

---

[6] And, it may be telling that the PHL Variable told the Trust it would no longer be offering the PAUL IV policy, but failed to disclose that it would offer *no* universal life insurance option.

dealing.  The purpose of a force-placement clause is to protect the lender's interest in the property securing the mortgage loan.  Plaintiffs allege a scheme whereby [the defendant] used its power to force-place insurance on the property to gain additional profits at plaintiffs' expense rather than using such power simply to protect its interest in the property.").

However, we cannot find that Rosenberg has stated a claim for breach of the implied covenant as to PHL Variable's refusal in 2020 to retroactively convert the remainder of the Policy to the PAUL IV product.  Under the Policy's express terms, conversion is limited to "any whole life or any universal life insurance plan [PHL Variable or its] affiliate companies offer *at the time of conversion*."  (Doc. No. 19 at p. 39.)  The PAUL IV product was not offered in 2020 when the Trust looked to convert the remainder of the Policy, so it was not a viable conversion option.  We will not read a requirement into the Policy that would contradict the contract's express terms.  *See Broederdorf v. Bacheler*, 129 F. Supp. 3d 182, 197 (E.D. Pa. 2015) (explaining that the implied covenant of good faith and fair dealing cannot "be pursued where its application would contradict the express terms of the agreement").

*       *       *

The motion to dismiss is denied in part and granted in part as to Count I.

### B.      *Counts II, III, and IV:  The Tort Claims*

In addition to her claim for breach of contract, Rosenberg also brings tort claims for fraudulent misrepresentation (Count II), negligent misrepresentation (Count III), and violation of Pennsylvania's UTPCPL (Count IV) against all Defendants.  Defendants argue that these claims are barred by the gist of the action doctrine and/or the economic loss doctrine, that Rosenberg cannot establish justifiable reliance or proximate causation for any claim, and that as to the Nassau Defendants, Rosenberg has not satisfied Rule 9(b)'s heightened pleading standard.  (Doc. No. 22 at pp. 18–28.)  We address each argument in turn.

16

### 1.     The Gist of the Action/Economic Loss Doctrine

The gist of the action doctrine "provides that an alleged tort claim against a party to a contract . . . is barred when the gist, or gravamen of the cause of action stated in the complaint, although sounding in tort, is, in actuality, a claim against the party for breach of its contractual obligations." *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 53 (Pa. 2014). "[T]he critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract" is "the nature of the duty alleged to have been breached." *Id.* at 68. "If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract." *Id.*; *see also Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 104 (3d Cir. 2001) ("[A] claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts.").

"If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort." *Bruno*, 106 A.3d at 68; *see also Bohler-Uddeholm Am., Inc.*, 247 F.3d at 103–04 ("The important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." (quotation marks omitted)). The gist of the action doctrine thus calls for a "fact-intensive judgment as to the true nature of a claim." *Williams v. Hilton Grp. PLC*, 93 F. App'x 384, 386 (3d Cir. 2004); *see also Downs v. Andrews*, 639 F. App'x 816, 819 (3d Cir. 2016) (explaining that "to determine whether an action is barred by the gist of the action doctrine [the court] must examine the factual allegations and ask, 'What's the case really about'" (citation omitted)).

Indeed, "[i]n the context of a single case, some [tort claims] may be barred by the gist of the action doctrine, while others may be deemed to be outside the scope of the contract at issue." *Brown & Brown Inc. v. Cola*, 745 F. Supp. 2d 588, 620 (E.D. Pa. 2010).

Like the gist of the action doctrine, the economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *McGuckin v. Allstate Fire & Cas. Ins. Co.*, 118 F. Supp. 3d 716, 719 (E.D. Pa. 2015) (quotation marks omitted); *see also Metter v. Capella Univ., LLC*, Civil Action No. 20-6405, 2021 WL 1610061, at *4 (E.D. Pa. Apr. 21, 2021) ("[T]he economic loss doctrine prohibits (1) common law claims (2) that assert economic losses (3) arising solely from contractual duties."). And its application similarly "turns on the determination of the source of the duty plaintiff claims the defendant owed." *Dittman v. UPMC*, 196 A.3d 1036, 1054 (Pa. 2018). "[I]f the duty arises under a contract between the parties, a tort action will not lie from a breach of that duty." *Id.* But if the duty arises independent of the contract, "then breach of that duty may support a tort action."[7] *Id.*

Here, Defendants argue that the gist of the action doctrine bars all of Rosenberg's tort claims against PHL Variable and that the economic loss doctrine bars her misrepresentation claims against PHL Variable and the Nassau Defendants. (Doc. No. 22 at pp. 18–28.) We begin with Rosenberg's misrepresentation claims before addressing her claims under the UTPCPL.

---

[7] As the case law suggests, the gist of the action doctrines and economic loss doctrines are in many respects coextensive in Pennsylvania. *See Rohrbach v. NVR, Inc.*, 545 F. Supp. 3d 237, 242 (E.D. Pa. 2021) ("Both doctrines serve to maintain the conceptual distinction between breach of contract claims and tort claims, and under Pennsylvania law, the economic loss doctrine has effectively subsumed the gist of the action doctrine."); *Sheridan v. Roberts Law Firm*, Case No. 2:19-cv-00467-JDW, 2019 WL 6726469, at *3 (E.D. Pa. Dec. 11, 2019) ("[*Dittman*] renders the gist of the action doctrine and the economic loss doctrine effectively coextensive under Pennsylvania law.").

a.      **Misrepresentation Claims**

First, we address Defendants argument that Rosenberg's misrepresentation claims against all Defendants are barred by the gist of the action doctrine and/or economic loss doctrine.

The Third Circuit's opinion in *Norfolk Southern Railway Co.* is instructive.  In that case, the plaintiff entered a long-term lease agreement with the defendant lessor that among other things, prohibited the defendant from issuing any stock without the plaintiff's prior written consent.  *Norfolk S. Ry. Co.*, 870 F.3d at 247, 249.  About 50 years after the parties initially entered the agreement, the defendant notified the plaintiff of its intent to "offer existing shareholders the right to purchase common shares" of the company.  *Id.* at 249.  The defendant did not, however, disclose its intent to use the proceeds from those sales to "restructure into a privately owned subsidiary or its desire to pursue investments in energy companies, despite" having discussed both options internally and despite its assurances to the plaintiff that it had disclosed "all available information of [the defendant's] plans at this point."  *Id.*  The plaintiff gave its consent to the stock issuance, and when the defendant restructured and pursued different investments, the plaintiff filed suit.  *Id.* at 255.  The defendant argued that the plaintiff's fraud claim was barred by the gist of the action doctrine, but the district court disagreed and after a bench trial, found in favor of the plaintiff.  *Id.*  On appeal, the Third Circuit affirmed, finding that the plaintiff's "claim [did] not arise from the contractual relationship between the parties, but rather from [the defendant's] fraudulent misrepresentations and omissions in seeking [the plaintiff's] consent."  *Id.* at 256.  Because the fraud claim "involve[d] a broader social duty owed to all individuals," the district court correctly found it was not barred by the gist of the action doctrine.  *Id.*

Here, Rosenberg's claims for fraudulent misrepresentation and negligent misrepresentation are premised on the same factual allegations—in November and December

2019, Rosenberg asked Defendants about the policies that would be available in 2020 and the price of those policies, and Defendants' representatives "falsely stated that they did not know that information and that such information was not available."  (Doc. No. 19 at ¶¶ 91, 101.)  This allegation is distinct from Rosenberg's breach of contract claims, which focus on whether PHL Variable was required under the contract to notify the Trust of its intent to no longer offer any affordable universal life insurance policy options.  In other words, Rosenberg's fraud claim is premised not on PHL Variable's obligations under the conversion provision of the contract, but on Defendants' "broader social duty . . . to refrain from defrauding" the Trust during the conversion process.  *See Norfolk S. Ry. Co. v. Pittsburgh & W.V. R.R.*, 153 F. Supp. 3d 778, 815 (W.D. Pa. 2015) ("While the Lease requires [the defendant] to seek the consent of [the plaintiff] before it issues stock, the substance of [the plaintiff's fraud] claim against [the defendant] is not that it failed to abide by that covenant.  It is instead predicated on the fraudulent misrepresentations/omissions of [the defendant's agent] in seeking the consent.  And a broader social duty requires [the defendant] to refrain from defrauding [the plaintiff] in the process.").

Defendants argue that "[t]here is no duty . . . under contract or tort, that requires PHL [Variable] to provide its customers with advance notice of its future business plans" and that "[a]bsent the terms of the Policy, PHL [Variable] would have no independent duty to provide a conversion option or any information regarding the products it intended to offer in the future." (Doc. No. 22 at p. 18.)  But this mischaracterizes Rosenberg's argument.  Her tort claims do not allege that Defendants had a duty to disclose its future business offerings without prompting. Instead, she argues that when asked for information about those offerings, Defendants had a duty to respond honestly.  In other words, Defendants could not respond that information on future

offerings was unavailable when such information was in fact available and known to them.[8]  *See Bruno*, 106 A.3d at 71 ("Accordingly, while Erie had contractual obligations under its policy to investigate whether mold was present, and also to pay for all property damage caused by mold, the substance of the Brunos' allegations is not that it failed to meet these obligations; rather, it is that Erie, during the course of fulfilling these obligations through the actions of its agents, acted in a negligent manner by making false assurances regarding the toxicity of the mold and affirmatively recommending to the Brunos that they continue their renovation efforts, which caused them to suffer physical harm because of their reasonable reliance on those assurances."); *see also Hemphill v. Nationstar Mortg. LLC*, Civil Action No. 18-2451, 2018 WL 4929864, at *9 (E.D. Pa. Oct. 10, 2018) ("Plaintiff's fraud claim cannot be dismissed under gist of the action. . . .  The mortgage note provided for the collection of some attorney fees and set out Plaintiff's payment obligations.  But to the extent that Plaintiff's constructive fraud claim turns on the false representations by Nationstar that Plaintiff would not incur any fees or costs for participating in the Diversion Program [during the foreclosure lawsuit], the alleged wrong does not stem from the failure to comply with the terms of the contract.  Rather, as in *Norfolk*, the claim arises from Nationstar's misrepresentations and omissions and therefore is cognizable in tort."); *Telwell Inc. v. Grandbridge Real Estate Capital, LLC*, 143 A.3d 421, 429 (Pa. Super. Ct. 2016) ("[The plaintiff] pled that [the defendant] fraudulently misrepresented the amount of the monthly payment.  According to the complaint, [the defendant] knew that it was overcharging Telwell, but withheld that information and continued to overcharge Telwell.  Such a claim sounds in tort as it implicates the 'societal duty not to affirmatively mislead or advise without

---

[8] As further explanation, the Court believes it could be a very different situation—at least with respect to the tort claims—if Defendants' representatives had told Rosenberg that information on the new policy was available, but they were not at liberty to discuss it.

factual basis.'" (quoting *Bruno*)); *cf. Vliet v. Lib. Mut. Personal Ins. Co.*, Civil Action No. 21-3766, 2022 WL 2109203, at *3 (E.D. Pa. June 10, 2022) ("The Court finds that the gist of the action doctrine does not bar Plaintiff's tort claims. [The plaintiff's breach of contract and UTPCPL claims] are not dependent on each other for success; Liberty Mutual may have made material misrepresentations about a policy that it has adhered to, or it may have accurately represented a policy that it has failed to adhere to.").

The Court will not apply the gist of the action doctrine or economic loss doctrine to preclude Rosenberg's claims for fraudulent misrepresentation and negligent misrepresentation.

      **b.**      **UTPCPL Claims**

Defendants also move to dismiss Rosenberg's UTPCPL claim against PHL Variable under the gist of the action doctrine.[9] The Second Amended Complaint paints the UTPCPL claim in broader strokes than the common law misrepresentation claims. (*See generally* Doc. No. 19 at ¶ 111.) In addition to alleging that PHL Variable violated the UTPCPL when its "representatives stated that they did not know the requested information and that such information was not available," (*id.* at ¶ 111.A.), Rosenberg also alleges that PHL Variable violated the UTPCPL when it:

- "precluded Plaintiff from exercising its right of conversion"

- "refused to disclose information to Plaintiff which was necessary for Plaintiff to exercise her right to convert the policy"

---

[9] Defendants have not moved to dismiss Rosenberg's UTPCPL claims as against the Nassau Defendants under the gist of the action doctrine. Instead, for the tort claims against the Nassau Defendants, Defendants limited their arguments to the economic loss doctrine. Unlike the gist of the action doctrine, the economic loss doctrine cannot bar UTPCPL claims. *See Earl v. NVR, Inc.*, 990 F.3d 310, 315–16 (3d Cir. 2021) (holding that the economic loss doctrine can no longer serve as a bar to the UTPCPL claims, but analyzing whether the gist of the action doctrine applied); *Okulski v. Carvana, LLC*, Civil Action No. 20-1328, 2021 WL 2223834, at *2 (E.D. Pa. June 2, 2021) ("Despite abrogating *Werwinski*'s finding that the economic loss doctrine may bar a plaintiff's cause of action under the UTPCPL, the *Earl* court did assume the gist of the action doctrine could preclude a UTPCPL claim.").

- "refused to provide information requested by Plaintiff regarding the [P]olicy"

- "refused to convert the Policy to policies which were available when Plaintiff requested the necessary information"

- "breached the implied duty of good faith and fair dealing by refusing to inform Plaintiff by or before December 31, 2019, that PHL Variable and [the] Nassau [Defendants] had determined previously that PHL Variable would no longer sell any universal life insurance policies"

(*Id.* at ¶ 111.B.–F.).  Because the duties implicated by these allegations arise out of the parties' contract, these actions are properly pursued, if at all, in contract, not in tort.  *See Hemphill*, 2018 WL 4929864, at *9 ("To the extent that the claim is premised on Defendants' charging fees in violation of the terms of the contract, Nationstar and Everbank are correct that such an action is properly pursued in contract rather than tort.").  Therefore, Rosenberg's UTPCPL claim against PHL Variable is barred by the gist of the action doctrine to the extent it is based on the allegations listed above.  For the reasons discussed in the previous section, however, we will allow Rosenberg to pursue her UTPCPL claim against PHL Variable to the extent it is based on her allegation that Defendants' representatives "stated that they did not know the requested information and that such information was not available."

*   *   *

In sum, we decline to dismiss Rosenberg's fraudulent misrepresentation and negligent misrepresentation claims under the gist of the action doctrine or economic loss doctrine.  We also decline to dismiss Rosenberg's UTPCPL claim as against PHL Variable to the extent that claim is based on Defendants' allegedly false representations about the unavailability of information.  The remainder of Rosenberg's UTPCPL claim against PHL Variable is dismissed.

### 2.   Justifiable Reliance and Proximate Causation

Next, Defendants argue that Rosenberg's tort claims should be dismissed because she has failed to plead the necessary elements of justifiable reliance and proximate cause as to each

claim.  (Doc. No. 22 at p. 23.)  Justifiable reliance and proximate cause are elements of

fraudulent misrepresentation, negligent misrepresentation, and UTPCPL claims.  *See Gregg v.*

*Ameriprise Fin.l, Inc.*, 245 A.3d 637, 645–46 (Pa. 2021) (outlining elements of fraudulent

misrepresentation and negligent misrepresentation and holding that the UTPCPL similarly

includes "a causation element, which requires a private plaintiff to demonstrate justifiable

reliance"); *see also Tran v. Metro Life Ins. Co.*, 408 F.3d 130, 135 (3d Cir. 2005) ("Justifiable

reliance on an alleged misrepresentation is an element of both fraudulent representation and

negligent misrepresentation causes of action in Pennsylvania.").

These elements require "the pleading of specific facts establishing a causal nexus

between the misrepresentation/omission and the plaintiff's injury, as well as specific facts

demonstrating that the plaintiff exercised the due diligence that a reasonable person under all the

circumstances would have exercised to protect his own interests."  *Servis One, Inc. v. OKS Grp.,*

*LLC*, Civil Action No. 20-4661, 2021 WL 6069168, at *1 n.1 (E.D. Pa. May 14, 2021); *see also*

*Palek v. State Farm Fire & Cas. Co.*, 535 F. Supp. 3d 382, 391 (W.D. Pa. Apr. 21, 2021) ("To be

justifiable, reliance on the representation of another must be reasonable." (quoting *Porreco v.*

*Porreco*, 811 A.2d 566, 571 (2002)).

These issues, however, are typically "question[s] of fact for the fact-finder to decide."

*Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 208 (Pa. 2007); *see also Metter*, 2021 WL 1610061, at

*6 ("Capella also argues that, even if its enrollment specialists represented that Metter would

receive twelve full credits, he could not justifiably rely on that representation . . . .  This

argument is not appropriate for the motion to dismiss stage.").  The justifiable reliance prong, in

particular, "requires a consideration of the parties, their relationship, and the circumstances

surrounding their transaction," which makes it particularly unsuited for decision at the motion to

dismiss stage. *Toy*, 928 A.2d at 208; *see also Tran*, 408 F.3d 130 at 135 ("Courts must consider

the relationship of the parties involved and the nature of the transaction when determining

whether one party's reliance on the allegedly fraudulent representations of another is justifiable.

The right to rely upon a representation is generally held to be a question of fact." (quotation

marks and citations omitted)).

 Nevertheless, a court may, in some circumstances, determine, "even at the motion to

dismiss stage, that a plaintiff's allegations of justifiable reliance fail as a matter of law." *Palek v.*

*State Farm Fire & Cas. Co.*, 535 F. Supp. 3d 382, 391 (W.D. Pa. 2021) (quotation marks

omitted); *see also id.* at 391–92 (finding it "objectively unreasonable for a consumer in

Plaintiffs' position to rely, without further inquiry," on the vague "representation that an

insurance policy will provide coverage for 'foreseeable' types of harm for the simple reason that

such a representation says nothing about what is or is not 'foreseeable'"); *Josaphs v. Lacy*, Civil

Action No. 21-4186, 2022 WL 474715, at *4 (E.D. Pa. Feb. 16, 2022) (dismissing tort claims

based on the home seller's assertion that she would complete certain repairs because the buyers

"discovered that [the seller] did not complete the repairs during their walkthrough of the property

two days before the scheduled settlement" but nevertheless, "elected to proceed with the

settlement without providing for completion of the repairs post-settlement. In short, they no

longer relied on any promise to complete the repairs at the time they closed on the property"); *cf.*

*ScanSource, Inc. v. Datavision-Prologix, Inc.*, No. Civ.A. 04-CV-4271, 2005 WL 974933, at *3

(E.D. Pa. Apr. 26, 2005) (dismissing fraud claim where the plaintiff alleged the defendants

"misrepresented the value of Datavision's accounts receivable and inventory" and that it relied

on those misrepresentations but it offered "no details whatsoever about the contours of this

asserted justifiable reliance" and "aver[red] nothing regarding the decisions that it made as a

result of Defendants' asserted misrepresentations"). But unlike *Palek* and *Josaphs*, this is not a case where the alleged misrepresentation was vague or contradicted by facts known to Rosenberg.

Defendants argue that Rosenberg's tort claims fail because her allegations show she relied "on her own assumption" that PHL Variable's 2020 product would include an option similar to the PAUL IV product offered in 2019. (Doc. No. 22 at p. 24.) Defendants assert that Rosenberg's "reliance on her independent guess as to PHL [Variable's] future product offerings is unjustifiable and demonstrates her actions . . . was [sic] not the product of Defendants' conduct." (*Id.* at pp. 24–25.[10]) And according to Defendants, Rosenberg's tort claims "flow from PHL [Variable's] *refusal* to provide substantive details regarding its planned 2020 product lineup, not from the affirmative nondisclosure regarding the call center representative's knowledge (or lack thereof) regarding that lineup." (*Id.* at p. 25.) But again, Defendants are raising disputes of fact.

Rosenberg does not merely allege that Defendants' representatives refused to provide information about the policies that would be offered in 2020. She claims that the representatives told her that there was no information available on those policies. Having received this affirmative representation, Rosenberg could have reasonably assumed that it meant Defendants were not conducting a major overhaul of PHL Variable's insurance offerings:

> Given that dropping an affordable universal life policy would represent a major strategy and marketing for Defendants and their affiliates, the Trust relied on the alleged unavailable [sic] of information related to any future policy options as evidence that an alternative to PAUL IV would be offered, and thus relied on the

---

[10] As an aside, we note that two of the three cases on which Defendants rely—*Blumenstock v. Gibson*, 811 A.2d 1029 (Pa. Super. Ct. 2002) and *Cooper v. Sirota*, 37 F. App'x 46 (3d Cir. 2002)— involved summary judgment motions, which reinforces the Court's conclusion that these issues are rarely appropriate for decision at the pleadings stage.

> absence of such information in deciding against converting the entire policy.

(Doc. No. 19 at ¶ 47.)  In other words, Rosenberg concluded that if Defendants were going to overhaul PHL Variable's business model, there would have been some available information on that front.  Taking into consideration PHL Variable's previous business model and the typical course of conduct in the insurance industry, we cannot at this time say that Rosenberg's reliance on the representatives' assertions was unjustified or that her ultimate conclusions were unreasonable.  *See Servis One, Inc.*, 2021 WL 6069168, at *1 n.1 (denying motion to dismiss fraud claim and finding that "Plaintiffs have presented a well-pleaded fraud claim" where the plaintiffs alleged that the defendants "made repeated material misrepresentations and omissions as to the Defendants' agreement not to seek further prosecution of the Defendants' criminal complaint in India"; that the plaintiffs "reasonably and justifiably relied upon the [defendants'] misrepresentations"; and that if the plaintiffs had known about the defendants' conduct they "could and would have taken appropriate action in India, including defending themselves").  *Contra Chalal v. Wells Fargo Asset Sec. Corp.*, Civil Action No. 2:17-cv-00516, 2018 WL 11099082, at *1 n.2 (E.D. Pa. May 7, 2018) (finding the "Plaintiffs' pleading of justifiable reliance . . implausible" and dismissing the plaintiffs' UTPCPL claim where the plaintiffs provided one conclusory allegation that a "representative of Defendant Wells Fargo misrepresented the terms of the loan modification program" but that allegation was undermined by the plaintiffs' mortgage and the parties' mortgage loan modification agreement, which "clearly articulated" the plaintiffs' responsibilities under the note).

Defendants also argue in passing that Rosenberg cannot show justifiable reliance because "Plaintiff's sole basis for contending" the falsity of the call center representatives' statements is her allegation that "it would not be likely—or even possible" that PHL Variable waited until

January 2020 to offer an entirely new insurance option.  (Doc. No. 22 at p. 26 (referring to this allegation as a "conclusory *res ipsa loquitor* truism").)  But that is not Rosenberg's "sole basis" for contending the falsity of the representative's assertions about the availability of future policy options.  To the contrary, in the same paragraph of the Second Amended Complaint, Rosenberg also alleges that the "Remembrance life product was already in existence no later than October 2019."  (Doc. No. 19 at ¶ 64.)

Last, Defendants argue that Rosenberg cannot demonstrate proximate causation because "she was still able to convert $10 million of the term Policy into a PAUL IV product at the time of the alleged nondisclosure."  (Doc. No. 22 at p. 25.)  The obvious counter to this is that Rosenberg, relying at least in part on Defendants' representatives' assertions, did *not* convert the other $10 million of the Policy.  (*See* Doc. No. 23 at p. 28 ("[H]ad Defendants not made such misrepresentations and omissions, Plaintiff would have converted the *entire* Policy rather than only half.").)

In short, the Court refuses to find at this early stage that Rosenberg has not alleged justifiable reliance and proximate causation as a matter of law.  If appropriate, Defendants may raise these issues again at summary judgment.

### 3.      Rule 9(b)'s Pleading Standard

Last, Defendants argue that Rosenberg's tort claims fail as against the Nassau Defendants because she has not met Rule 9(b)'s heightened pleading standard as to them.  (Doc. No. 22 at p. 27.)  Assuming without deciding that Rule 9(b)'s heightened pleading standard applies to Rosenberg's negligent misrepresentation and UTPCPL claims as well as her fraudulent misrepresentation claim, we find that standard satisfied.

Defendants assert that apart from "individual references to each of the three Nassau Defendants in the 'Parties' section of the [Second Amended Complaint], Plaintiff pleads her tort

and UTPCPL allegations generally against PHL [Variable] and the Nassau Defendants . . .
without specifying which entity in particular uttered the alleged misrepresentations to her." (*Id.*)
For this proposition, Defendants cite *Indianapolis Life Insurance Co. v. Hentz*, Civil Action No.
1:06-CV-2152, 2008 WL 4453223 (M.D. Pa. Sept. 30, 2008).  In that case, the insured
individuals brought fraudulent misrepresentation claims against their insurance agent, the
company for which he worked, the parent of that company, and a separate subsidiary.  *Id.* at *1.
The complaint referred to the three companies collectively as the "Insurance Company" for all
substantive pleadings, and the defendants moved to dismiss the fraud claims, arguing that this
collective identifier was insufficient under Rule 9(b).  *Id.* at *11.  The court agreed, explaining
the applicable law:

> In a case involving multiple defendants, each defendant is entitled
> to be apprised of the roles they each played in the alleged scheme,
> and absent a compelling reason, a plaintiff is not normally entitled
> to treat multiple corporate defendants as one entity. . . .  One
> exception to this general rule is that vicarious liability need not be
> plead [sic] with particularity, so the principal can be held liable for
> the fraudulent acts of its agents if the agency relationship is
> adequately alleged.

*Id.* (citations omitted).

In *Hentz*, the plaintiff failed to meet this standard.  The complaint contained "no
allegations as to how these grouped together companies relate to each other, noting only that [the
insurance company] is a subsidiary to [the parent company]." *Id.*  In addition, the complaint
lacked "any allegations that explain the connection of [the other subsidiary] to the facts of this
case beyond lumping it together with the other Defendant insurance companies." *Id.*  The court,
however, did not rest its dismissal on these deficiencies alone, finding that "[e]ven if [it]
assume[d] that these related corporations can sort out their own involvement in the scheme and
prepare a defense," the plaintiffs allegations were nonetheless deficient because they failed to

include "the date, place, or time that any of the misrepresentations took place." *Id.* at *12. And there was "no mention of the place or method by which the misrepresentations were made to the [plaintiffs] so there is no way to know whether these misrepresentations were in person, by phone, or mail." *Id.*

Here, by contrast, Rosenberg alleges when and how the alleged misrepresentations occurred: "In November and December 2019," Rosenberg requested "by phone and by email" information about the policies that would be available in 2020, and Defendants' "representatives stated that they did not know that information and that such information was not available." (Doc. No. 19 at ¶¶ 34, 91, 101, 111.A.) Unlike *Hentz*, the only deficiency raised by Defendants is to Rosenberg's reference to them in the collective. Neither *Hentz* nor the Seventh Circuit case on which it relies were willing to dismiss a complaint under Rule 9(b) for this failure alone. *See Hentz*, 2008 4 4453223, at *11 (suggesting that the "related corporations can sort out their own involvement in the scheme and prepare a defense" but that other pleading deficiencies nonetheless warranted dismissal); *see also Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328–29 (7th Cir. 1994) ("[D]efendants are entitled to be apprised of the roles they each played in the alleged scheme, and absent a compelling reason, a plaintiff is normally not entitled to treat multiple corporate defendants as one entity. We will assume for purposes of our discussion that this omission can also be overlooked as well, however, given that the three corporate defendants in this case are related corporations that can most likely sort out their involvement without significant difficulty.").

And unlike *Hentz*, here, Rosenberg outlines the Nassau Defendants' relationship to each other and PHL Variable explaining that PHL Delaware "is the parent company of PHL Variable," that Nassau Insurance Group Holdings "is the parent company of PHL Delaware,"

and that Nassau Financial Group "is the parent company of NIGH [Nassau Insurance Group Holdings]."  (Doc. No. 19 at ¶¶ 8–10.)  She also explains that the three Nassau Defendants "either together or individually, own and control PHL Variable" and when they acquired PHL Variable in 2016, they began making decisions for PHL Variable, along with providing "management, customer service, and other services to PHL Variable and its policyholders."  (*Id.* ¶¶ 11, 20–21.)  *Contra Hentz*, 2008 WL 4453223, at *11–12 ("[H]ere, the Complaint contains no allegations as to how these grouped together companies relate to each other, noting only that Indianapolis Life is a subsidiary to AmerUs Group.  Further, the Complaint does not contain any allegations that explain the connection of AmerUs Life to the facts of this case beyond lumping it together with the other Defendant companies.").  The lack of specificity in this case seems related not to the fraud allegations themselves but rather to the division of responsibility and corporate structure of Defendants, which is presumably within Defendants' knowledge.

For those reasons, we decline to find Rosenberg's allegations deficient under Rule 9(b).

### C.   *Count V: Unjust Enrichment*

Last, Rosenberg brings a claim for unjust enrichment against PHL Variable, alleging that if she "must or does convert $10 million of the Policy to a Remembrance policy or policies providing $10 million in coverage," the Trust will have "conferred a non-gratuitous benefit on PHL Variable in the form of excessive premiums."  (Doc. No. 19 at ¶ 120.)  She claims that allowing PHL Variable to "retain the premiums would be inequitable given" Defendants' "unjust and improper conduct in handling and responding to Plaintiffs' requests for information regarding conversion" and her "efforts to convert the Policy."  (*Id.* at ¶ 122.)  Defendants argue that this claim should be dismissed because the Policy governs the Trust's relationship with PHL Variable.  (Doc. No. 22 at pp. 26–27.)

31

"In Pennsylvania, a litigant cannot maintain an unjust enrichment claim when the parties have entered into a written agreement." *Sunshine v. Reassure Am. Life Ins. Co.*, 515 F. App'x 140, 145 (3d Cir. 2013); *see also SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 228 (3d Cir. 2022) ("[T]he Pennsylvania Supreme Court has left no doubt that unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract, regardless of how harsh the provisions of contracts may seem in light of subsequent happenings." (quotation marks omitted)). "Pennsylvania has long ascribed to the rule that when the parties' relationship is based on an express written contract no unjust enrichment recovery is permitted." *Montanez*, 876 F. Supp. 2d at 515 (quotation marks omitted).  Where, however, "there is some dispute as to whether a valid, enforceable written contract exists," courts have allowed unjust enrichment claims to stand.  *Id.* at 516 (collecting cases).

Here, there is no real dispute that the Policy is an express written contract governing the parties' relationship, including the conversion dispute before us.  Because there is no dispute that the Policy is valid and enforceable, Rosenberg cannot assert an unjust enrichment claim as an alternative to her claim for breach of contract against PHL Variable.

Rosenberg argues that her claim for unjust enrichment should nevertheless stand as a companion to her fraud claims.  (Doc. No. 23 at p. 31.)  We are not convinced.  Rosenberg labels her unjust enrichment claim as an "alternative" count and not as a companion claim.  *See SodexoMAGIC, LLC, v. Drexel Univ.*, 333 F. Supp. 3d 426, 472–73 (E.D. Pa. 2018), *aff'd in relevant part by* 24 F.4th at 228 ("[A]n unjust enrichment claim based on a theory of quasi-contract may be pled as an alternative to the breach of contract claim" or "may be pled as a companion, not an alternative, to a claim of unlawful or improper conduct as defined by law—e.g., a tort claim.").  Likewise, she brings the unjust enrichment claim, like the breach of contract

claim, only against PHL Variable, and not, like the fraud claims, against all Defendants.  (*See* Doc. No. 19 at p. 20.)

For those reasons, the motion to dismiss Count V is granted..

## V.    CONCLUSION

Defendants' motion to dismiss is granted in part and denied in part.  An appropriate Order follows.