**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SARA ROSENBERG,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 21-2673-KSM** |
| **PHL VARIABLE INSURANCE COMPANY,** et al., | |
| Defendants. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                    **January 5, 2023**

Plaintiff Sara Rosenberg, acting as trustee for the Douglas Rosenberg 2004 Trust (the "Trust"), brings claims for breach of contract, fraudulent misrepresentation, negligent misrepresentation, and violation of Pennsylvania's Unfair Trade Practices & Consumer Protection Law ("UTPCPL") against Defendant PHL Variable Insurance Company.[1]  PHL Variable moves for summary judgment in its favor on all claims.  For the reasons discussed below, the motion is granted.

## I.   BACKGROUND FACTS

Viewing the evidence in the light most favorable to Plaintiff, the relevant facts are as follows.

---

[1] Plaintiff also brought claims for fraudulent misrepresentation, negligent misrepresentation, and violation of the UTPCPL against Defendants PHL Delaware, LLC, Nassau Insurance Group Holdings, L.P., and Nassau Financial Group, L.P.  (*See* Doc. No. 19 at 15–20.)  These Defendants are holding companies that neither issued life insurance policies nor provided services or employees for PHL Variable.  Plaintiff does not contest their dismissal, so summary judgment is granted as to them.  (*See* Doc. No. 47 at 8 n.1.)  This Memorandum considers only the remaining claims against PHL Variable.

### A.       The Initial Policy

On May 8, 2001, PHL Variable issued a $20 million Phoenix term life insurance policy on the life of Maury Lane Rosenberg (the "Policy").  (Doc. No. 40-15 at 2.)  Douglas Rosenberg is Maury's son and the named beneficiary for the Trust, which is, in turn, the named owner and beneficiary on the Policy.[2]  (Doc. No. 46 at ¶¶ 2–3, 7; *see also* Doc. No. 40-17 (identifying the Trust as the Policy's primary beneficiary and owner); Doc. No. 19 at ¶¶ 16, 18.)  The Policy was set to last 32 years, with an expiration date of May 8, 2033.  (Doc. No. 40-15 at 2.)  During the first 20 years that the Policy was in effect, the annual premium was fixed at a rate of $68,675— resulting in premium payments totaling more than $1.3 million.[3]  (*Id.* at 4; *see also* Doc. No. 46 at ¶ 8; Doc. No. 40-4 at 13 ("PHL[ Variable's] records reflect that $1,381,739.03 was paid in premiums on term policy 40017529.").)

In addition to paying those premiums and being entitled to the death benefit, the Trust retained certain "lifetime benefits," including the right to convert the Policy to a new policy of insurance during the first 20 years that it was in effect.  (*See* Doc. No. 40-16 at 5 (Form T604 PA); Doc. No. 46 at ¶ 6 (agreeing that "the Policy was issued on Form T604"); *see also* Doc. No. 40-15 at 2 (setting the final conversion date as May 8, 2021).)  More specifically, during that time, the Trust could "convert this Policy, without evidence of insurability, to a new Policy on the life of the same insured under this Policy but on a different plan of insurance."  (Doc. No. 40-

---

[2] When the Policy was issued, the named owner and beneficiary was the "Irrevocable Trust between Maury Lane Rosenberg as Settlor and Herbert Sier as Trustee, for the Benefit of Sara Rosenberg During her Lifetime and Children Between Us Before Her Demise."  (Doc. No. 40-14 at 2 (Application for Life Insurance); *see also* Doc. No. 40-15 at 2 (Duplicate of Insurance Policy) ("Beneficiary and Owner as stated in the application unless later changed.").)  It is not clear from the record when or how the Trust became the Policy's owner and beneficiary, but by November 14, 2019, the Trust was listed as the owner in Policy documents.  (*See* Doc. No. 40-17 at 4.)

[3] The annual premium became significantly higher for years 21 through 32, ranging from $2.1 to $5.9 million per year.  (Doc. No. 40-15 at 4; Doc. No. 46 at ¶ 9.)

16 at 10.)  This conversion right extended to "any whole life or universal life insurance plan" that PHL Variable or its affiliates "offer[ed] at the time of conversion."  (*Id.*)

###    B.       The Trust's Conversion Options

Whole life insurance and universal life insurance are the "two most common types of 'permanent' insurance," but they "differ with respect to features and benefits."  (Doc. No. 40-23 at ¶ 9.)  Whole life policies "are more rigid and provide more certainty because they require fixed, periodic premiums be paid in exchange for fixed benefits and guaranteed cash value accumulation."  (*Id.*)  Universal life policies, by contrast, are "more flexible but have less certainty because they allow the policyholder to vary the timing and amount of premiums and permit the insurer to periodically adjust the cost of insurance rates and credited interest rates that can impact the cash value accumulation and the amount of premiums needed to maintain coverage."  (*Id.*)

In 2019, PHL Variable and its affiliates offered only one whole life policy and one universal life policy for conversion:  a universal life product titled PAUL IV and a whole life product known as Remembrance Life.  (Doc. No. 40-3 at 5; Doc. No. 40-4 at 6; Doc. No. 40-23 at ¶¶ 13–14; Doc. No. 46-13 at 52:15–23.)

###    C.       PHL Variable Phases Out PAUL IV

PHL Variable developed PAUL IV in the late 2000s, but by 2009, it had stopped marketing PAUL IV for new sales.  (Doc. No. 40-23 at ¶¶ 10, 14.)  The company made its last new sale of PAUL IV in 2016 (Doc. No. 40-3 at 6), and although it remained an option for term conversions, regulatory changes in 2017 foretold the end of PAUL IV as a term conversion option (*see* Doc. No. 40-4 at 8, 13; Doc. No. 46-13 at 27:15–28:21).  That year, state regulations and the federal tax code were amended to require all life insurance contracts issued on or after January 1, 2020 to be priced based on the 2017 commissioners standard ordinary ("CSO")

mortality table and to consider principal-based reserving.  (Doc. No. 40-4 at 8, 13; Doc. No. 46-13 at 27:15–28:21.)  PAUL IV was based on the 2001 CSO mortality table, not the 2017 table, and PHL Variable lacked the "infrastructure needed to calculate principal-based reserves for the PAUL IV product."  (Doc. No. 40-4 at 8, 13.)  Thus, PHL Variable knew in 2017 that it would not be able to offer PAUL IV in any capacity after December 31, 2019.

Accordingly, PHL Variable began having internal discussions about discontinuing PAUL IV as a conversion option in September 2019, with the expectation that it would be replaced by Remembrance Life beginning January 1, 2020  (Doc. No. 40-4 at 8; Doc. No. 46-1 (Email from Velitchka LaPier, Product Manager, AAPA, to Larry Segal, et al.); Doc. No. 46-5 (Email from Segal to LaPier, et al.) (responding with his "initial thoughts" on the company's conversion program); *see also* Doc. No. 40-4 at 8–9 (stating that the company formally decided on November 5, 2019 to offer Remembrance Life beginning January 1, 2020 and discontinue use of PAUL IV after December 31, 2019); Doc. No. 46-25.)  To this end, PHL Variable's conversion program team developed a new cost simulator, sought regulatory approval in those states where Remembrance was not approved, and outlined strategies for telling customers about the transition.  (*See generally, e.g.*, Doc. No. 46-1; Doc. No. 46-2; Doc. No. 46-5; Doc. No. 46-19; Doc. No. 46-25.)

As to this last issue, at the end of October, PHL Variable began including a specific warning on conversion quotes for policyholders:  "Please be advised our PAUL IV product will no longer be available after 12/31/2019 as a conversion options product."  (Doc. No. 46-2 (Email from Elba Perez-Martin, Contract Services/Case Manager, to Jacob Freedman, et al.); *see also, e.g.*, Doc. No. 40-17 at 2 (November 15, 2019 conversion quote sent to Plaintiff).)  Call center representatives also told clients about the upcoming change, but were not themselves supposed to

discuss the specifics of the new policy until mid-December 2019.  (*See* Doc. No. 46-19 at 2

(telling representatives that they should not give any advice to clients about timing conversion);

Doc. No. 46-4 at 2–3 (Email from Sue Harris to Linda Warner, et al.) (telling call center

representatives that they should not discuss available products but instead should tell

policyholders that "the product available for conversion will be covered in the quote and

illustration" sent to the relevant policyholder)[4]; *see also* Doc. No. 46-23 at 2 (November 8, 2019

email from one call center representative to a superior showing that representatives knew only

that the new conversion option would be to a whole life policy)).)  On December 17, PHL

Variable sent an email blast, telling call center representatives, "If you receive a call for a Term

Conversion you may tell them that the product for the Term Conversion will be Remembrance.

Remembrance is a whole life policy."  (Doc. No. 46-24 (directing recipients to an attachment

labeled "Talking Point Q&A" for any questions they received).)

December 31, 2019 was the last day that PAUL IV was available in any state.  (Doc. No.

40-11 at 172:4–8; *see also* Doc. No. 40-23 at ¶ 11.)  Beginning January 1, 2020, Remembrance

Life was the only option for conversion offered by PHL Variable.  (Doc. No. 40-3 at 5; Doc. No.

40-6 at 6.)

### D.    *The Trust Requests Information on Conversion in 2019*

While PHL Variable worked internally to transition from PAUL IV to Remembrance Life

as its primary conversion product, the Trust's agents were exploring conversion options for the

---

[4] Larry Segal, the conversion team member who created the "tool" for creating quotes for the cost of conversion to Remembrance, circulated a final version of the tool internally at the end of the day on December 12, 2019.  (Doc. No. 46-6 at 2–5; *see also id.* at 2 (email from Harris to Segal, et al.) (stating that the "tool is great" and that she "will update the communication that the tool has been updated with the compliance recommendations and we are ready to proceed with preparing the Remembrance quotes").  *But see* Doc. No. 40-11 at 106:11–24 (testifying that the "operations team didn't have the tool" to issue quotes until mid-January and were waiting on the tool to be developed); *id.* at 188:15–21 (explaining that the operations team did not have the final tool until mid-January).)

Policy, which had a final conversion date of May 8, 2021.  Typically, when a policyholder—

either directly or through an agent authorized to act on the owner's behalf—requests a

conversion quote, a call center representative records the request and the face value for

conversion and sends the request to PHL Variable's conversion processing team, which prepares

a written quote and application for the policyowner's consideration.  (Doc. No. 40-4 at 10; *see

also* Doc. No. 46-4 at 3 (Email from Harris to Warner, et al.).)  If the policyowner wishes to

move forward with conversion, they complete the application and submit it with a check for the

initial premium.  (Doc. No. 40-4 at 10.)

 Although Plaintiff Sara Rosenberg is the only trustee for the Trust, she deferred to her

son, Douglas Rosenberg, and the Trust's insurance agent, Professional Planning Associates

("PPA"), to request information on conversion options for the Policy.  (*See* Doc. No. 40-8 at

55:3–10 (deferring to Douglas and PPA for "information on the dates that the Trust requested

pricing information and the structure of any future product offerings that PHL would offer the

Trust for policy conversion"); *see also* Doc. No. 46-7 at 54:16–21 (testifying that she does not

know which dates the Trust requested information on the pricing and structure of future

conversion options and that the attorney "would have to ask Doug"); *id.* at 56:10–15 ("Q: . . .

[D]id you ever personally request information on the pricing and structure of any future product

from PHL Variable or Nassau Re's representatives?  A: I don't think so.").)

 Records[5] and deposition testimony show that Douglas and PPA reached out to PHL

Variable three times in late 2019 to formally request conversion quotes.  First, on November 15,

---

[5] PHL Variable's "regular business practice is to log all incoming calls with the policy number
associated with the caller and to identify the nature of the call."  (Doc. No. 40-13 at ¶ 7 (Susan Zophy,
Decl.) (explaining that all inbound calls to the "800" number are recorded).)  In addition, "requests for
quotes on the cost of policy conversion are catalogued under a specific work type and associated with the
relevant policy file."  (*Id.*)  For this case, PHL Variable "collected its call logs on the Policy, four

PHL Variable sent the Trust a quote to convert the full $20 million Policy to PAUL IV.  (Doc. No. 40-17.)  On December 9, Douglas called PHL Variable to request a conversion quote (Doc. No. 40-18 at 2–3), and two days later, PHL Variable provided a quote to convert $10 million of the Policy to PAUL IV (*id.* at 5–26).  Finally, on December 12, Meredith Waters with PPA, spoke with PHL Variable (Doc. No. 40-19 at 2–3), and on December 16, PHL Variable provided two quotes, one to convert $1 million of the Policy and one to convert $5 million of the Policy to PAUL IV (*id.* at 4–35).

In addition to these communications, Douglas Rosenberg "cold called" PHL Variable "multiple times" that fall to ask generally about future pricing options.  (Doc. Nos. 40-7 at 18:4–13; *see also id.* at 20:25–21:3 ("Cold call means I could just call the agency without verifying who I am because they won't speak to me because I'm not, like, on record.").)  Douglas testified that when he asked about the price of the product that would replace PAUL IV in 2020, the call center representative told him that they "ha[d] no idea how expensive the future product would be" and that Douglas would "have to go to a CEO to ask that question . . . only the higher ups would know information about that."  (*Id.* at 42:19–43:6, 81:4–7.)  Douglas did not reach out to anyone in management to request additional information.  (*Id.* at 43:7–8.)

Meredith Waters also spoke with PHL Variable representatives about future conversion options in her calls with the company and was similarly told that PHL Variable "may be changing [the conversion option] by the end of the year" and that "PAUL may not be available." (Doc. No. 46-11 at 34:4–18.)  When she asked for additional details, the representative told her that "it may be a whole life [policy], but really not much was known about it at that point."  (*Id.*)

---

conversion quotes, and more than a dozen call recordings associated with the policy . . . from [the] November and December 2019 timeframe."  (*Id.*)

On December 10, 2019, Meredith Waters emailed Plaintiff, stating that she had spoken with PHL Variable and "found out":

> [T]he insurance product that Phoenix term policies convert to is changing in 2020. They currently convert to Universal Life policies, but they supposed [sic] to be changing to Whole Life policies. Unfortunately, this product is not as desirable, especially as it costs more in premiums. To this end, I ordered you current conversion quotes for $1, $5, and $10 mill in case you want to convert part of your policy before the end of the year."

(Doc. No. 40-5 at 2; *see also* Doc. No. 40-7 at 60:2–11 (Douglas confirming that this email advised himself and his mother that "the product that Phoenix term policies convert to starting in 2020 would no longer be a universal life policy but would be a whole life policy and that product would cost more in premiums"); *id.* at 88:17–23 ("Q: But Meredith Waters advised the Trust that she had learned that the replacement product would be a whole life product; correct? A: Correct. Q: And you understood that it would be a whole life product; correct? A: Correct, by that email.").) On December 18, Meredith Waters resent her email to the Plaintiff, and this time, copied Maury Rosenberg. (Doc. No. 40-3 at 5–6; Doc. No. 40-4 at 6.)

On December 24, 2019, the Trust converted $10 million of the Policy to PAUL IV.[6] (*See* Doc. No. 40-13 at ¶ 10.)

### E.   The Remainder of the Policy Lapses in 2021

After the new year, PHL Variable and the Trust continued to discuss conversion options for the remaining $10 million of the Policy. On January 14, 2020, PHL Variable sent the Trust a quote to convert $5 million of the Policy to Remembrance Life. (Doc. No. 40-20.) That quote reflected an annual premium of $450,398, more than double the $197,334 annual premium

---

[6] The Trust simultaneously sold the right to collect on the $10 million converted policy to a nonparty, Magna Life. (*See* Doc. No. 40-12.)

reflected in the quote sent just one month earlier to convert $5 million of the Policy to PAUL IV. (*Compare* Doc. No. 40-20 at 11, *with* Doc. No. 40-19 at 31.)

Unhappy with this increase, Douglas Rosenberg called PHL Variable, and a call center representative forwarded his call to Elba Perez-Martin, the head of PHL Variable's conversion processing team.[7]  (Doc. No. 50 at ¶ 30.)  He asked whether the Trust could convert the remaining $10 million to PAUL IV, but she told him that it was too late and that Remembrance Life was the only conversion product available now.  (Doc. No. 40-7 at 22:5–23; *see also id.* at 82:6–8 ("Q:  Again, the conversation with Elba was in 2020, correct?  A:  Exactly.").)  The Trust did not convert any portion of the Policy to Remembrance Life in 2020.

In 2021, PHL Variable repriced Remembrance Life, lowering the cost of annual premiums.  (*See* Doc. No. 40-23 at ¶ 16.)  And on May 5, 2021, three days before the Policy's final conversion date, PHL Variable sent the Trust quotes to convert $5 million and $10 million of the Policy to Remembrance Life under the new pricing scheme.  (*See* Doc. No. 40-21.)  But even under the new structure, a $5 million conversion carried an annual premium of $341,898, approximately 1.7 times more than the premium required to convert $5 million of the Policy to PAUL IV in 2019.  (*Id.* at 13.)

---

[7] The conversion *processing* team provides policyholders with quotes for conversion.  This is different from the conversion *project* team, which was tasked with internally preparing PHL Variable and its affiliates to switch from PAUL IV to Remembrance Life as the only policy available for term conversions.  Although Perez-Martin was the head of PHL Variable's conversion processing team, the evidence suggests she was, at most, a minor player on the company's conversion project team.  (Doc. No. 50 at ¶ 30; *see also* Doc. No. 50-2 at 30:14–31:2 ("Q: Were you at all involved in the effort to offer Remembrance as the only product available for conversion?  A: No. . . . . Q: Is it true that you had no involvement in the effort to offer Remembrance as the only product for conversion in 2020?  A: Yes, no involvement."); *id.* at 48:3–6 ("Q:  Were you involved in any discussions about what the call centers should tell policyholders about Remembrance Life prior to 2020?  A: No.").)  Plaintiff is thus incorrect when she refers to Perez-Martin as "a critical member" of the "conversion project team."  (Doc. No. 47 at 12.)

The final conversion date passed without the Trust converting the remainder of the Policy, and the Policy's increased premium structure went into play.  (*See* Doc. No. 40-15 at 2; *see also* Doc. No. 40-22 (requiring a premium totaling $283,142.06 to prevent lapse).)  The Trust did not pay the increased premium, and on May 9, 2021, PHL Variable sent the Trust a Notice to Prevent Lapse.  (Doc. No. 40-22.)  One month later, the Policy lapsed due to nonpayment.  (Doc. No. 40-13 at ¶ 12.)

## II.    PROCEDURAL HISTORY

Plaintiff filed this action against PHL Variable on June 14, 2021.  (Doc. No. 1.)  In the Second Amended Complaint, she alleged that PHL Variable "knew and withheld from Plaintiff and its other policyholders its intention to only offer a far more expensive conversion product in order to induce its policyholders not to convert before December 31, 2020 [sic]."  (Doc. No. 19 at ¶ 62; *see also id.* at ¶ 73 ("[PHL Variable] did not inform the 2004 Trust that [PHL Variable] would not sell any universal life policies in 2020, despite having made the decision prior to December 31, 2019.").)  She brought five causes of action against PHL Variable:  (1) fraudulent misrepresentation, (2) negligent misrepresentation, (3) violation of Pennsylvania's UTPCPL, (4) breach of contract, and in the alternative, (5) unjust enrichment.  PHL Variable moved to dismiss the Second Amended Complaint in its entirety (Doc. No. 22), and the Court granted that motion in part and denied it in part (Doc. Nos. 32, 33).

As to the misrepresentation claims, the Court found that under the gist of the action doctrine, the Trust was prohibited from bringing misrepresentation and UTPCPL claims to the extent they arose out of duties flowing from the parties' written contract, i.e., the Policy.  (*See* Doc. No. 32 at 22–23.)  However, those claims remained to the limited extent they were based on PHL Variable's "allegedly false representations about the unavailability of information" on the new conversion option.  (*Id.* at 23; *see also id.* at 20–21 (explaining that Plaintiff "argues that

10

when asked for information about [future conversion] offerings, [PHL Variable] had a duty to respond honestly.  In other words, [PHL Variable] could not respond that information on future offerings was unavailable when such information was in fact available and known to them").)

As for the contract claims, the Court found that PHL Variable had stated a claim for breach of the contract's express provisions and breach of the implied covenant of good faith and fair dealing.  (*See id.* at 10, 15.)  The Trust alleged that PHL Variable failed to offer every available whole life and universal life policy offered by it or its affiliates in violation of the Trust's express right to convert to "any whole life or any universal life insurance plan" that PHL Variable or its "affiliate companies offered at the time of conversion."  (*Id.* at 8.)  And because the Trust alleged that the Remembrance Life policy, the only plan offered for conversion in 2020, was the equivalent of no option, the Trust had also stated a claim for violation of the implied covenant of good faith and fair dealing.  (*Id.* at 15.)  Because the Policy was an express contract governing the parties' relationship, the Court dismissed the unjust enrichment claim. (*Id.* at 31–33.)

After discovery on the remaining claims, PHL Variable moved for summary judgment, arguing that Plaintiff has failed supply evidence to support a cause of action for misrepresentation, violation of the UTPCPL, or breach of contract.  (Doc. No. 40.)  Plaintiff opposes that motion, arguing that disputes of fact prohibit summary judgment.  (Doc. Nos. 47, 48.)

III.    **STANDARD OF REVIEW**

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "[T]he mere existence of *some* alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248.  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  And at "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and alterations omitted).

"[A]party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted); *see also id.* at 325 ("[T]he burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case."). After the moving party has met its burden, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 323 (quotation marks omitted); *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

"[T]his standard makes clear that, even though the right to a jury trial is implicated, a nonmoving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (internal citations omitted). "[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F.Supp.2d 490, 493 (E.D. Pa. 2010).

## IV. DISCUSSION

PHL Variable moves for summary judgment as to all claims asserted against it. The Court addresses Plaintiff's tort claims before turning to her claim for breach of contract.

### A. *Tort Claims*

#### 1. <u>Legal Standard</u>

Plaintiff brings claims for fraudulent misrepresentation, negligent misrepresentation, and violations of Pennsylvania's UTPCPL. (Doc. No. 19 at 15–20.) Although distinct causes of action, the three claims have common elements.

First, for fraudulent misrepresentation, a plaintiff must prove by clear and convincing evidence: "(1) a representation; (2) that is material to the transaction at issue; (3) made falsely, with knowledge of its falsity or reckless disregard as to whether it is true or false; (4) with the intent to mislead another person into relying on it; (5) justifiable reliance; and (6) an injury proximately caused by the reliance." *Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 645–46 (Pa. 2021); *see also Moffatt Enters., Inc. v. Borden, Inc.*, 807 F.2d 1169, 1174 (3d Cir. 1986) (identifying elements of fraudulent misrepresentation as "(1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation and (5) damage

13

to the recipient as the proximate result" (quoting *Scaife v. Rockwell-Standard Corp.*, 285 A.2d 451, 454 (Pa. 1971))); *Rosemont Taxicab Co. v. Phila. Parking Auth.*, 327 F. Supp. 3d 803, 830 (E.D. Pa. 2018) ("Because of the heightened standard of proof for fraud claims, in order to avoid summary judgment the party with the burden must present evidence of fraud from which a jury could, by clear and convincing evidence, find such fraud.").

 "Negligent misrepresentation shares three of the . . . elements of fraudulent misrepresentation, namely:  (1) a misrepresentation, (2) justifiable reliance by the recipient, and (3) damages proximately cause[d] by that reliance." *Fort Wash. Resources, Inc. v. Tannen*, 858 F. Supp. 455, 461 (E.D. Pa. 1994).  "It differs from fraudulent misrepresentation in the standard of proof and mental state required; only a preponderance of the evidence is required and the alleged misrepresenter must be shown only to have failed to 'exercise reasonable care or competence in obtaining or communicating the information.'" *Id.* (quoting *Browne v. Maxfield*, 663 F. Supp. 1193, 1202 (E.D. Pa. 1987)); *see also Moffatt Enters., Inc.*, 807 F.2d at 1174–75 ("In responding to the defendant's motion for summary judgment, the plaintiffs met their burden of coming forward with evidence which could lead a jury to find clear and convincing proof of fraud and preponderant proof of negligent misrepresentation."); *Gregg*, 245 A.3d at 646 ("The four elements of a common law claim for negligent misrepresentation are:  (1) a misrepresentation of a material fact; (2) made under circumstances in which the actor should have known of its falsity; (3) with an intent to induce another to act on it; (4) thereby causing injury to a party who justifiably relied upon the misrepresentation.").

 Last, to state a claim under § 201-2(4)(xxi) of the UTCPCL, the plaintiff must prove the defendant engaged in "deceptive conduct during a consumer transaction that creates a likelihood of confusion or misunderstanding and upon which the consumer relies to his or her financial

detriment." *Gregg*, 245 A.3d at 649–50.  The "test for deceptive conduct" under this provision is "whether the conduct has a tendency or capacity to deceive," and this test is a "lesser, more relaxed standard than that for fraudulent or negligent misrepresentation." *Id.* at 649 (quotation marks omitted).  "It is the capacity to deceive rather than the actor's state of mind that renders conduct actionable under the amended catch-all provision of the [UTP]CPL," *id.* at 648, such that "any deceptive conduct, 'which creates a likelihood of confusion or misunderstanding,' is actionable under 73 P.S. § 201-2(4)(xxi), whether committed intentionally (as in fraudulent misrepresentation), carelessly (as in negligent misrepresentation), or with the utmost care (as in strict liability)," *Gregg v. Ameriprise Fin., Inc.*, 195 A.3d 930, 939 (Pa. Super. Ct. 2018).

### 2.   <u>Analysis</u>

Here, Plaintiff's three tort claims are premised on the same alleged representation:  in November and December 2019, Plaintiff asked PHL Variable about the policies that would be available for conversion in 2020 and the price of those policies, and PHL Variable's representatives responded that "they did not know the requested information and that such information was not available."  (*See* Doc. No. 32 at 19–23 (holding that Plaintiff's tort claims were not barred by the gist of the action doctrine as to this alleged misrepresentation).)  PHL Variable argues that there is "no admissible evidence in the record that any Trust representatives made a request to PHL[ Variable] in 2019 for 2020 conversion pricing or that PHL[ Variable] answered such a request by representing that the pricing information was not available."  (Doc. No. 40-24 at 19.)  Plaintiff seems to acknowledge that the record lacks any proof of this type of back-and-forth exchange, but she nevertheless argues that multiple Trust representatives requested policy and pricing information and received "incomplete responses."  (Doc. No. 47 at 12–13.)  The evidence does not support Plaintiff's assertion.

Plaintiff testified that she did not personally request information on the structure and pricing of future policy offerings, but instead, relied on her son, Douglas Rosenberg, and the Trust's insurance agent, PPA, to request information about the structure and pricing of future product offerings.  (Doc. No. 40-8 at 55:3–10.)

### a.      Douglas Rosenberg

Douglas Rosenberg testified that he "cold call[ed]" PHL Variable "multiple times" to ask about the price of future conversion options.[8]  The representatives responded that "they didn't have" future pricing information, that they "couldn't give it to [him] until after the New Year," and that he would "have to go to a CEO to ask that question . . . only the higher ups would know information about that."  (Doc. No. 40-7 at 17:5–11, 18:4–13, 42:19–43:6, 81:4–7.)  Plaintiff has put forth no evidence that these responses were false, incomplete, or misleading.

Instead, the record shows that PHL Variable did not begin internally considering new conversion options until the end of September 2019.  (Doc. No. 46-1 (Email from LaPier to Segal, et al.); Doc. No. 46-5 (Email from Segal to LaPier, et al.) at 2–3.[9])  And the final pricing tool was not circulated within the conversion project team until mid-December 2019.  (Doc. No. 46-6 (Email from Segal to Harris, et al.) at 2 (Segal noting that he circulated the "final tool"

---

[8] By "cold call," Douglas Rosenberg meant that he would call the agency without verifying his identity, because he was not "on record" as a representative of the Trust.  (Doc. No. 40-7 at 20:25–21:3).)  Because Douglas did not identify himself, recordings of these calls were not saved in connection with the Trust's account.  (*See* Doc. No. 40-13 at ¶ 7.)  Ironically, call center records show that Douglas formally requested a $10 million conversion quote from PHL Variable in December 2019, and those records identify him as the trustee.  (*See* Doc. No. 40-18 at 3.)

[9] In these initial emails, Segal included his "initial thoughts on just a few items for further consideration," noting that "[s]ince we know what the Remembrance premium would be, and assuming we're talking about a state where Remembrance has been approved, then I don't see a reason why we couldn't share with [customers] what the R[emembrance ]L[ife] premium would be were they to defer conversion into 2020, which would likely be far less attractive than PAUL IV."  (Doc. No. 46-5 (Email from Segal, to LaPier, et al.) at 2–3.)  But this assertion does not suggest that *call center representatives* had pricing information when they spoke with the Trust's representatives.  (*See* Doc. No. 46-19 at 2 ("We are still waiting for official talking points/verbiage to be provided from legal that Call Center can use.").)

earlier in the day to Harris); *see also id.* (Harris responding that the "tool is great, easy to use and very clear").)  There is no evidence in the record to show when that tool was more broadly circulated within the team, let alone when (or if) it was provided to the call center representatives with whom Douglas spoke.

To the contrary, it appears call center representatives were privy to little information about the conversion project or future offerings.  In October and November 2019, they were told that PAUL IV would not be offered for any term conversions after 2019.[10]  (Doc. No. 40-3 at 6–7; *see also* Doc. No. 46-23 at 2.)  Then, on November 26, 2019, Operations Manager Sue Harris circulated an email for forwarding to call center staff, which explained to representatives that "effective immediately . . . if a call is received requesting [a] conversion quote[,] do not discuss available options, products, or time frame[s]."  (Doc. No. 46-4 (Email from Harris to Linda Warner, et al.) at 3.)  Instead, call center representatives were to "ask for the face amount the [customer] want[s] to convert" and "fax over" the quote request to the contract service team."  (*Id.*; *see also id.* at 2 (clarifying that call center representatives were not to mention any product offerings, including PAUL IV and should instead say, "the product available for conversion will be covered in the quote and illustration").)  Finally, on December 17, representatives were told that the new conversion option would be to Remembrance Life, a whole life policy.  (*See* Doc. No. 46-24.)

---

[10] Plaintiff argues that "customer service representatives were informed" on "October 28, 2019 and October 29, 2019 . . . that Remembrance Whole Life was the only conversion option that would be available in 2020."  (Doc. No. 47 at 12; *see also* Doc. No. 48 at ¶ 2.)  For that proposition, she relies on an email from Perez-Martin to the "team."  (*See* Doc. No. 48 at ¶ 2 (citing Doc. No. 46-2 at 2).)  However, Perez-Martin's deposition testimony shows that by "team," she was referring to the "contract service team, the billing team and DRS [distribution relationship] team."  (Doc. No. 50-2 at 89:16–23.)  Plaintiff has not cited any evidence to show that this information was also shared with call center representatives. To the contrary, in a follow up email, a manager for the call center representatives asked what information the representatives should be given and how that information should be shared with policyholders who called in to request a conversion quote.  (Doc. No. 46-3 at 2.)

In short, Plaintiff has not put forth any evidence that the call center representatives' statements—that they did not know any information about pricing and that Douglas Rosenberg would have to seek that information from officials higher up within the company—were false or misleading.

### b.     PPA

That leaves the conversations initiated by PPA.  Two PPA employees are relevant to this case:  David Waters and Meredith Waters.  David Waters testified that PPA agents called PHL Variable about rates "that fall," but he could not offer any specifics about those conversations, testifying that he did not know if he ever initiated a call with PHL Variable to discuss rates, whether PPA formally requested a quote in 2019 for the 2020 conversion product, or which clients PPA represented when it made inquiries.  (Doc. No. 40-9 at 40:5–19, 41:5–42:11.)  David Waters knew only that "there were numerous other clients who had term policies similar to [the Trust] that we were looking to convert as, again, part of our normal process of both helping our clients and also trying to secure a new sale of a new product for permanent insurance . . . .  So we always—we look at options for our clients."  (*Id.*)  David Waters's vague assurance about PPA's "normal process" to "look at options for [its] clients" is not evidence that a specific PPA employee requested information on the structure and pricing of 2020 offerings, let alone that PHL Variable's representatives made false statements in response to a specific request.  *See Bortz*, 729 A.2d at 560 (explaining that a claim for intentional misrepresentation requires evidence of "a representation . . . made falsely, with knowledge of its falsity or recklessness as to whether it is true or false").  *Contra Sacks v. DJA Auto.*, Civil Action No. 12–284, Civil Action No. 12-284, 2013 WL 210248, at *12 (E.D. Pa. 2013) (sending UTPCPL claim to jury where the defendant's salesperson represented that "there was no odometer discrepancy" for the car being sold to the plaintiff, but the salesperson later testified that she saw a CarFax report flagging that

the car did have a potential odometer discrepancy and there was a dispute between the parties about whether that report was shared with the plaintiff); *id.* at \*14–15 (granting the plaintiff leave to amend to add a fraud claim based on this evidence).

Unlike David Waters, Meredith Waters remembered speaking with PHL Variable representatives about future options. However, her testimony likewise fails to establish that the representatives misrepresented the information known to them. Meredith Waters testified that in December 2019 she spoke with PHL Variable about its conversion options and was told the company "may be changing it by the end of the year." (Doc. No. 46-11 at 34:4–18.) But when she "asked more questions, like what type of product was it going to be changing to, what were our options," she "wasn't given much information other than that it may be a whole life . . . really not much was known about it at that point." (*Id.*) Meredith Waters's recollection lines up with an email that she sent to Plaintiff on December 10, 2019, in which she explained that she "spoke to [PHL Variable]" and "found out that the insurance product that the [Trust's] term policies convert to is changing in 2020, but they supposed [sic] to be changing to Whole Life policies. Unfortunately, this product is not as desirable, especially as it costs more in premiums." (Doc. No. 40-5 at 2.)

The representation given to Meredith—that PHL Variable was changing its conversion option to a whole life product at the end of the year and that they knew little about the conversion—aligns with the information known to call center representatives in mid-December 2019. (*See* Doc. No. 46-23 at 2; Doc. No. 46-24.) Moreover, Meredith's email to Plaintiff that a whole life policy is "not as desirable" because it will carry higher premiums, shows that a reasonable policyholder would not have been misled or deceived by the company's representations. Although representatives did not provide the name of the policy or its exact

19

pricing structure, a reasonable policyholder would have known that the future whole life policy was necessarily less desirable and more expensive than the PAUL IV option that had been offered to date.[11]

In sum, Plaintiff has put forth no evidence that PHL Variable's representatives made false or misleading statements about future conversion options, and Plaintiff's tort claims fail.

### B.   *Contract Claims*

Plaintiff's only remaining claim is for breach of contract.  She claims PHL Variable breached express provisions of the Policy along with the implied duty of good faith and fair dealing.

### 1.   Breach of Express Terms

"[F]or a plaintiff to maintain a successful cause of action for breach of contract, the plaintiff must demonstrate the following:  (1) the existence of a contract between the plaintiff and defendant, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) damages resulting from a breach of that duty."  *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1125 (Pa. Super. Ct. 2004); *see also In re Lincoln Nat'l COI Litig.*, 269 F. Supp. 3d

---

[11] Plaintiff argues that PHL Variable "affirmatively decided not to" tell policyholders that the whole life policy would be the Remembrance policy.  But PHL Variable did not have a duty to tell policyholders the name of the whole life policy.  As the Court explained in its Memorandum on the motion to dismiss, the gist of the action doctrine limits the scope of Plaintiff's tort claims because the parties' relationship is governed by contract.  Accordingly, Plaintiff's tort claims are viable *only* to the extent she claims PHL Variable's representatives failed to respond honestly to the Trust's inquiries about future offerings:

> [Plaintiff's] tort claims do not allege that Defendants had a duty to disclose its future business offerings without prompting.  Instead, she argues that when asked for information about those offerings, Defendants had a duty to respond honestly.  In other words, Defendants could not respond that information on future offerings was unavailable when such information was in fact available and known to them.

(Doc. No. 32 at 20–21.)

622, 632 (E.D. Pa. 2017) ("In order to state a claim for breach of contract, a plaintiff must allege the existence of a contract, including its essential terms, a breach of a duty imposed by the contract and resulting damages.").  Plaintiff claims that PHL Variable breached the lifetime benefits provisions outlined in Part 6 of the Policy, which gives the Trust the "right to convert this Policy, without evidence of insurability, to a new Policy on the life of the same insured under this Policy but on a different plan of insurance." (Doc. No. 40-16 at 10.)  This provision specifies that the new policy must be "a[ ] whole life or a[ ] universal life insurance plan" that PHL Variable or its "affiliate companies offer at the time of conversion . . . so long as it provides for a level death benefit and [PHL Variable or its] affiliate companies issue that plan with the Face Amount requested." (*Id.*)  Plaintiff argues that PHL Variable breached this provision: (1) in 2019 when it offered the Trust a PAUL IV policy but not the Remembrance Life product, despite having regulatory approval for Remembrance Life; and (2) in 2020 when it offered only Remembrance Life but not PAUL IV, despite allowing conversion to PAUL IV in New York and Maine in January 2020.[12]

### a.      2019 Conversion Option

First, Plaintiff argues that PHL Variable breached the Policy's express provisions in 2019 because it "should have—but failed to—identify the Remembrance Whole Life policy as a conversion option available in December 2019." (Doc. No. 47 at 27.)  But Plaintiff has not shown that Remembrance Whole Life was an available conversion option when the Trust requested quotes in 2019.  To the contrary, Remembrance Life was a conversion option only for policies with a face value of $100,00 or less. (*See* Doc. No. 50-4 at 41:1–12; *see also id.* at

---

[12] New York and Maine are the two states where PHL Variable sought regulatory approval of the Remembrance Life policy at the end of 2019.

40:5–41:16 (explaining that "the policy that's being converted into has face amount limits that were filed with the states in the admin system . . . [s]o if there's a $10 million term policy being converted and the choice is Remembrance, there's no way to issue that $10 million policy for Remembrance" because it is "only issued under a certain face amount").[13]  All of the conversion quotes requested by the Trust in 2019 were for face amounts of $1 million or more.  (*See* Doc. Nos. 40-17, 40-18, 40-19.)  Therefore, Remembrance Life was not a policy that PHL Variable or its affiliates offered "with the Face Amount requested."  (*See* Doc. No. 40-16 at 10.)

### b. 2020 Conversion Option

Next, Plaintiff claims that PHL Variable breached the Policy in January 2020 when the Trust's representatives requested a conversion quote, because PHL Variable did not offer PAUL IV to the Trust even though PAUL IV was still a conversion option in New York and Maine. (Doc. No. 47 at 28.)  For this proposition, she relies on two pieces of evidence.  First, Plaintiff points to an October 29, 2019 internal email between two members of the conversion project team, which said that "Remembrance will be [the] new product available for conversion starting 1/1/20 for all states **except** NY/ME . . . .  Paul IV will continue to be available for conversions in **NY and ME only** (diff rates). (until Remembrance is approved in these states)."  (Doc. No. 46-19 at 2.)  But this email is not evidence that Paul IV was, in fact, offered as a conversion option in those states in January 2020.

---

[13] Plaintiff argues that summary judgment is inappropriate "because PHL[ Variable] did not develop evidence on which policy forms were approved for use in 2019, whether it identified those options to the Trust, and why those policies were not offered as conversion options."  (Doc. No. 47 at 27.) This argument fails because it misunderstands the burden of proof.  Plaintiff must produce evidence to support its breach of contract claim.  PHL Variable is not required to disprove that claim.  In addition, as the discussion above shows, PHL Variable did produce evidence explaining why Remembrance was not offered as a conversion option—Remembrance was not available when the resulting policy would have a face amount above $100,000.

In addition, the record shows that the company later changed its position on offering PAUL IV in New York and Maine. Internal notes for the conversion project record a "Decision 11.5.19" that "As of 1.1.2020, Remembrance Life will be the solution for all conversions. We will no longer issue PAUL IV policies. No PAUL IV policies will have effective dates later than 12.31.19. No applications for PAUL IV will be accepted after 12.31.2019." (*See* Doc. No. 46-25 at 2.) The notes then outline the filings that need to be made in each state, including New York and Maine, to effect this change. (*Id.*; *see also* Doc. No. 40-4 at 8–9 ("On or about November 5, 2019, a decision was formally made to no longer issue PAUL products after December 31, 2019 and that Remembrance Life would be offered for term conversions beginning January 1, 2020."); Doc. No. 40-3 at 5–6 (listing Remembrance as the only whole or universal policy listed by PHL Variable or its affiliates, NLA and NNY); Doc. No. 40-23 at ¶ 11 ("The PHL[ Variable] and Nassau Life Insurance Company ('NNY') versions of PAUL IV were discontinued and not offered after December 31, 2019. Nassau Life and Annuity Company ('NLA') never offered the PAUL IV product.").[14])

Plaintiff also points to evidence that New York did not approve of the Remembrance Life policy form until January 30, 2020, arguing that this means "PAUL IV policies were available as a conversion options [sic] from a PHL[ Variable] affiliate (Nassau Life Insurance Company) and perhaps even PHL[ Variable] itself through January 2020." (Doc. No. 47 at 28.) But again, this is not evidence that PAUL IV was actually offered in January 2020. And it is not reasonable to infer as much because PHL Variable was not required to wait for final regulatory approval

---

[14] In her response to PHL Variable's Statement of Undisputed Facts, Plaintiff disputes whether NLA and NNY were PHL Variable's only affiliates during the relevant period. (*See* Doc. No. 46 at 5.) The Court does not find this dispute material, however, because Plaintiff has not argued or produced evidence showing that any of these other purported affiliates offered a whole life or universal life option other than the Remembrance Life product.

before using Remembrance Life as a conversion option in New York. (*See* Doc. No. 50-4 at

57:17–58:24.) Michael Donovan, Chief Actuary for Nassau Company of New York, testified

that the Remembrance product *was* available in New York in January 2020:

> Q:      Okay. Thank you. So let's take New York. As of January
> 1st, 2020, could Nassau Life Insurance Company of New York have
> issued a Remembrance policy as a conversion option for a term
> policy?
>
> A:      It could because in December of 2019, Remembrance was
> filed in New York on a certified basis, which is a—essentially a file
> in—if you're—if you comply with certain provisions and make
> certain certifications as part of the filing. And so we—the company
> did that filing in December, which made it available for the
> Company effective January 1st.
>
> Q:      And is that true even if the New York regulator had not—
> did not, in fact, approve the Remembrance as a conversion option
> until after January 1st, 2020?
>
> . . . .
>
> A:      Yeah. Well so—I mean, the regulator doesn't approve
> whether it's used for conversions or not. It just approves the policy
> form. But the method of filing that was used was CL-6 filing, which
> is a certified method, which is, essentially, you submit the filing with
> certain requirements and it's, you know, instantly available for sale.
> The regulator doesn't approve. . . . So I mean, there's really, there's
> really no situation where they wouldn't approve it and it wouldn't
> be available as of January 1st under that filing method.

(*Id.*) Plaintiff has not put forth any evidence that disputes this testimony.

Because Plaintiff has not produced any evidence that PHL Variable or its affiliates

actually offered a whole or universal life policy, other than the Remembrance Life product, in

January 2020, PHL Variable is entitled to summary judgment on this claim.

### 2.      **Breach of Implied Terms**

In addition to her claim for breach of the contract's express provisions, Plaintiff also

argues that PHL Variable breached the implied covenant of good faith and fair dealing. (Doc.

No. 47 at 29–31.)  Section 205 of the Second Restatement of Contracts outlines this covenant, stating, "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."  Restatement (Second) of Contracts § 205; *see also Baker v. Lafayette Coll.*, 504 A.2d 247, 255 (Pa. Super. Ct. 1986) ("We hold that the College had a limited duty to evaluate Baker in good faith which is defined by the terms of the College's contractual undertakings.  This is consistent with the general duty of contracting parties to perform their contractual obligations in good faith set forth in the Restatement (Second) of Contracts at section 205.").  "Good faith" has been defined as "[h]onesty in fact in the conduct or transaction concerned."  *Creeger Brick & Building Supply Inc. v. Mid-State Bank & Tr. Co., SEDA*, 560 A.2d 151, 153 (Pa. Super. Ct. 1989); *see also Power v. Erie Family Life Ins. Co.*, 813 F. App'x 751, 753–54 (3d Cir. 2020) (same).

Although the full meaning of "good faith" varies with context, *Baker*, 504 A.2d at 255, courts agree that "the duty of good faith limits the parties' ability to act unreasonably in contravention of the other party's reasonable expectations."  *Montanez v. HSBC Mortg. Corp. (USA)*, 876 F. Supp. 2d 504, 513 (E.D. Pa. 2012) (quoting 3A Arthur L. Cobin, *Corbin on Contracts* § 654A(B), at 89 (Supp. 1994)).  For example, a party may breach this duty through "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."  *Presque Isle Colon & Rectal Surgery v. Highmark Health*, 391 F. Supp. 3d 485, 513 (W.D. Pa. 2019).  This duty also precludes a party from exercising its discretion under a contract in an unreasonable manner.  *Montanez*, 876 F. Supp. 2d at 513; *see also In re Lincoln Nat'l COI Litig.*, 269 F. Supp. 3d at 638 (explaining that Pennsylvania recognizes "an implied covenant of good faith where, as here, the defendant is

25

expressly given a constrained amount of discretion under the Policy").  And in the insurance

context, the covenant requires that the insurer "deal with the insured fairly, honestly, and

objectively," and that it "act in good faith at all times, giving the interests of the insured the same

consideration it gives its own."  *Ironshore Spec. Ins. Co. v. Conemaugh Health Sys. Inc.*, 423 F.

Supp. 3d 139, 153 (W.D. Pa. 2019); *see also Dercoli v. Pa. Nat'l Mut. Ins. Co.*, 554 A.2d 906,

909 (Pa. 1989) (concluding that insurers were "bound to deal with the [insured] on a fair and

frank basis, and at all times, to act in good faith," and explaining that the "duty of an insurance

company to deal with an insured fairly and in good faith includes the duty of full and complete

disclosure as to all of the benefits and every coverage that is provided by the applicable policy or

polices along with all requirements, including any time limitations for making a claim").

At the motion to dismiss stage, the Court found that Plaintiff stated a claim for violation

of the duty of good faith because she alleged that in 2019, PHL Variable failed to inform the

Trust of its intent to no longer sell any universal life insurance policies.  In reaching that

conclusion, the Court relied on a similar case from the Southern District of New York, *see*

*Wiseman v. Ing Groep, N.V.*, No. 16-cv-07587 (AJN), 2017 WL 4712417 (S.D.N.Y. Sept. 28,

2017), explaining that in *Wiseman*, the court refused to dismiss the plaintiff's claim for breach of

the implied covenant of good faith and fair dealing because "[a]lthough no contractual provision

required the Insurers to maintain a generally available policy" for conversion, the plaintiff

"plausibly alleged that a reasonable person purchasing the same insurance policy as Plaintiff

would assume . . . that the Insurers would maintain such a policy or would notify her and adjust

her premiums if such a policy became unavailable."  *Id.* at *8–9; *see also id.* at *9 (finding that

the plaintiff "plausibly alleged that a reasonable customer in Plaintiff's position could have

presumed that *some* policy would exist for which the customer could exchange the original policy").

Unlike the company in *Wiseman*, PHL Variable offered the Trust a conversion option in 2020—the Remembrance Life product.  Nevertheless, at the motion to dismiss stage, the Court found *Wiseman*'s analysis instructive because Plaintiff alleged that the annual premiums under the Remembrance policy were so much higher than the premiums under the PAUL IV option that conversion was "economically unfeasible," and the Remembrance policy was the equivalent of "no option."  Following *Wiseman*'s reasoning, PHL Variable was thus required to notify the Trust that it would no longer offer PAUL IV or a similar universal life plan.  In so concluding, the Court, relying on the allegations in the Second Amended Complaint, found it "telling that PHL Variable told the Trust it would no longer be offering the PAUL IV policy," but allegedly "failed to disclose that it would offer *no* universal life insurance option."  (Doc. No. 32 at 15 n.6.)

Because this is summary judgment, the Court now looks beyond the pleadings to the evidence produced in discovery.  That evidence shows that PHL Variable satisfied the notice requirement described in *Wiseman* because it warned policyholders, including Plaintiff, that it would not offer PAUL IV as a conversion option after December 31, 2019, and that the conversion option in 2020 would be a whole life policy.  Indeed, on December 10, 2019, Meredith Waters emailed Plaintiff to explain that she had spoken with PHL Variable and "found out":

> [T]he insurance product that Phoenix term polices convert to is changing in 2020.  They currently convert to Universal Life policies, but they supposed [sic] to be changing to Whole Life policies.  Unfortunately, this product is not as desirable, especially as it costs more in premiums.  To this end, I ordered you conversion quotes for

> $1, $5, and $10 mill in case you want to convert part of your policy
> before the end of the year.

(Doc. No. 40-5 at 2.)  Meredith Waters resent this email to Plaintiff and her husband, Maury

Rosenberg, on December 18, 2019.  (*Id.*)  And during his deposition, Douglas Rosenberg

confirmed that the email advised him and Plaintiff that "the product that Phoenix term policies

convert to starting in 2020 would no longer be a universal life policy but would be a whole life

policy and that policy would cost more in premiums."  (Doc. No. 40-7 at 60:2–11; *see also id.* at

88:17–23.)  *See Wiseman*, 2017 WL 4712417, at *9 ("[W]hile the contract expressly limited the

exchange provision to other life insurance policies offered at the time of the exchange, it has

been plausibly alleged that a reasonable customer in Plaintiff's position could have presumed

that *some* policy would exist for which the customer could exchange the original policy or, in the

alternative, *that the Insurers would notify customers when it ceased carrying policies for which*

*an exchange could be made*  . . . ." (second emphasis added)).

Plaintiff argues that PHL Variable's "term conversion project reflects the absence of

good faith from start to finish, culminating in PHL[ Variable's] decision to withhold important

information from the Trust and other policyholders."  (Doc. No. 47 at 31.)  But again, the

evidence shows that PHL Variable repeatedly warned clients that it would not offer PAUL IV

after December 31, 2019, and that representatives told Meredith Waters, who in turn told

Plaintiff, that the new product would be a less desirable, more expensive whole life policy.  To

the extent Plaintiff argues that the Trust was entitled to know the name, price, and structure of

future offerings, she overstretches *Wiseman* and the covenant of good faith and fair dealing and

asks us to impose an obligation on PHL Variable that is divorced from the Policy's express

provisions.  *See Power*, 813 F. App'x at 754 ("The policy does not require Erie to remind Power

when premiums are due or otherwise notify him before the policy lapses.  To impose such a duty

would not force Erie to honor in good faith the policy's specific clauses; it would saddle Erie

with an obligation altogether divorced from them." (quotation marks omitted)); *see also*

*Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000) ("Courts have

utilized the good faith duty as an interpretive tool to determine the parties' justifiable

expectations in the context of a breach of contract action, but that duty is not divorced from the

specific clauses of the contract and cannot be used to override an express contractual term."); *cf.*

*id.* at 92 (warning that "[i]f construed too broadly, the doctrine [of good faith] could become an

all-embracing statement of the parties' obligations under contract law, imposing unintended

obligations upon parties and destroying the mutual benefits created by legally binding

agreements").

Plaintiff also argues that PHL Variable acted in bad faith because the company "learned

of the need to update their policy offerings by January 1, 2020, no later than 2017 or 2018 when

the regulations and principles on which PHL[ Variable] now relies were adopted."  (Doc. No. 47

at 30; *see also id.* at 31 (arguing that PHL Variable demonstrated a "lack of diligence" by having

a "three-year delay between their need to change conversion options and their eventual decision

to do so on a rush basis, and their apparent efforts to delay providing information even when

requested").)  But this delay does not equate to an actionable "lack of diligence" under the

Policy.  There is no evidence to suggest that PHL Variable's delay in switching conversion

products prevented Plaintiff from making a knowledgeable decision related to its conversion

options.  To the contrary, PHL Variable timely informed policyholders, including Plaintiff, that it

would no longer offer PAUL IV, and in early December 2019, PHL Variable told the Trust's

representative that it was switching to a whole life product.  At that point, the Trust still had

weeks to convert the entire $20 million policy to PAUL IV.

Last, Plaintiff argues that PHL Variable willfully rendered imperfect performance because it purposefully "delay[ed] responding to policyholder inquiries." (*Id.* at 31.) It is unclear from the briefing when and how PHL Variable's responses to the Trust were inadequate or "delay[ed]." But to the extent Plaintiff argues that PHL Variable generally delayed telling call center representatives the specifics of the conversion project (or otherwise limited the information available to those representatives), there is nothing to suggest this delay was done in bad faith. Again, PHL Variable provided the necessary information (i.e., that it was converting to a whole life policy) in time for customers to consider early conversion, while PAUL IV was still a viable option. Indeed, Plaintiff ultimately pursued early conversion when she elected to convert $10 million of the Policy to PAUL IV in December 2019. Plaintiff has not put forth any evidence that the delay was meant to induce policy lapse. To the contrary, any delay appears to be a necessary consequence of PHL Variable working internally to finalize the structure and pricing tools for the new version of Remembrance Life. *See Silvis v. Ambit Energy L.P.*, 674 F. App'x 164, 168 n.7 (3d Cir. 2017) (The plaintiff "offers no allegation of bad faith beyond the potential breach; to show bad faith the claimant must show some intentional mischief in breaching a contractual duty."). *Contra. Entergy Ark., Inc. v. Nebraska*, 358 F.3d 528, 553 (8th Cir. 2004) ("The evidence of Nebraska's continuing efforts to thwart and delay the facility strongly supports the district court's finding that USE was denied a license without regard to the merits of its application. Indeed, the evidence shows that Nebraska was prepared to do whatever was necessary to avoid hosting [the] disposal facility—even if it meant ignoring its own consultants and denying the license on pretextual grounds. . . . Such a denial in the context of Nebraska's commitments in the Compact is the essence of bad faith, a calculated 'evasion of the spirit of the bargain.'" (quoting Restatement (Second) of Contracts § 205 cmt. d)).

\*  \*  \*

As a reminder, the covenant of good faith is intended to prevent *bad faith*.  The Court cannot find that the PHL Variable acted in bad faith when it warned the Trust that its conversion option was changing to a whole life policy, which Plaintiff knew was less desirable and more expensive, and Plaintiff nevertheless chose to convert only a portion of the Policy to the less expensive PAUL IV option.

## V. CONCLUSION

Defendants' motion for summary judgment is granted in its entirety.  An appropriate Order follows.